931 So.2d 1076 (2006)
In re Judge William A. ROE.
No. 2006-0-1243.
Supreme Court of Louisiana.
June 23, 2006.
PER CURIAM.
This matter comes before the court on the recommendation of the Judiciary Commission of Louisiana ("Commission"), pursuant to La. Const. art. V, § 25(C), that Judge William A. Roe of the 25th Judicial District Court, Parish of Plaquemines, State of Louisiana, be publicly censured and ordered to pay the costs of the prosecution of these proceedings. For the reasons that follow, we adopt the recommendation of the Commission and publicly censure Judge Roe, as well as order him to pay costs.

*1077 FACTS AND PROCEDURAL HISTORY
In 1994, a class of oyster fishermen holding oyster leases in the Breton Sound area filed suit against the State of Louisiana and the Department of Natural Resources, asserting that their oyster leases were destroyed or damaged as a result of the State's operation of the Caernarvon Freshwater Diversion Project, which altered salinity levels in the waters covering the oyster fishermen's leases. Avenal v. State of Louisiana, No. 38-266 on the docket of the 25th Judicial District Court for the Parish of Plaquemines.[1] Judge Roe presided over the trial of the Avenal case, which resulted in an award to the plaintiffs of more than $1 billion.
Andy Wilson, the State's lead counsel in Avenal, filed an appeal of the trial court's judgment. On May 18, 2003, while the appeal was pending, two newspaper articles were published in The Times-Picayune about the Avenal case. The first article, entitled "Sinking Chances," correctly quoted Judge Roe or paraphrased comments attributed to him, as follows:
Roe blamed the Plaquemines verdict on the state and the tactics of its lead attorney, Andy Wilson. In fact, Roe, who said he would have awarded much less money to the plaintiffs, said the state's biggest mistake was insisting on a jury trial.
Roe said he repeatedly pressed the issue with Wilson, who represented the state in both cases [Avenal and Alonzo]. He said he was concerned about the state's ability to get a fair trial in a parish known for its "negative attitude toward the state."
Roe said: "I must have asked Mr. Wilson five times, `Are you sure you want a jury? You want a group of Plaquemines Parish residents to decide a claim against the state?' ... I thought it was a major disadvantage to the state's case to have a jury trial."
* * *
Roe said he didn't play favorites in court. "I think I was equally harsh to all sides," he said.
* * *
And though he said he believes the jury awarded far too much money to the plaintiffs, he said that wasn't enough for him to overturn the award. "That's not the standard for reducing a jury's finding," Roe said. "It's whether or not there's been sufficient evidence to support it."
Featured on the second page of the article was a photograph of Judge Roe posing on the banks of the Mississippi River with his judicial robe billowing in the wind.
The second article, entitled "State's attorney is blasted from all sides," also quoted comments made by Judge Roe about Mr. Wilson:
"Did I tease Andy Wilson? Absolutely," acknowledged Judge William Roe, who oversaw a 2000 jury trial in which the plaintiffs were awarded an estimated $1.3 billion. "Did he deserve it? Absolutely."
On June 25, 2003, the Office of Special Counsel (OSC) asked Judge Roe to respond to the allegations in the newspaper articles. By letter dated August 4, 2003, Judge Roe explained that he was contacted by a newspaper reporter who was writing a series of articles on coastal erosion and *1078 the effect the Avenal litigation had on the State's efforts in that regard. Furthermore, because the lead attorney for the plaintiffs, Wendell Gauthier, had just died, the reporter indicated that he wished to talk about Mr. Gauthier's last trial before his death and how Mr. Gauthier interacted with Andy Wilson. Judge Roe agreed to meet with the reporter but said that he would not go into detail about any of his rulings or the judgment.
During the meeting, which lasted for more than two hours, Judge Roe and the reporter discussed the political history of Plaquemines Parish, the judge's legal career, and his election to the bench. They also discussed the contrasting personalities of Mr. Gauthier and Mr. Wilson. The reporter then asked Judge Roe about the allegations made by Mr. Wilson in his appellate brief concerning the judge's treatment of him. Judge Roe responded by suggesting that he was equally harsh to all sides, a quote which later appeared in the newspaper article.
Judge Roe further explained that the quotes attributed to him concerning the size of the jury's verdict were taken verbatim from the transcript of the post-trial motion hearings. The transcript of the hearings reflects that Judge Roe stated, on the record and in response to the State's motion for new trial, that he believed the judgment against the State was too high and that he would have awarded a much smaller amount. Judge Roe also indicated that he could not modify the jury's judgment on that basis because there was sufficient evidence to support the award.[2]
Finally, the reporter asked Judge Roe about the selection of the jury. Judge Roe again referred the reporter to the transcript, but he commented that the jury selection was particularly difficult in the Avenal case because many citizens in the parish are involved in the oyster industry. Judge Roe also mentioned to the reporter that there had been extensive pre-trial discussion about whether the case should be tried by the judge and not by a jury, and that in Judge Roe's view, the case would have been "better managed" as a bench trial.

PROCEEDINGS BEFORE THE COMMISSION

Formal Charge
On December 12, 2005, the Commission filed Formal Charge 0263 against Judge Roe, alleging that he engaged in judicial ethical misconduct by making improper public comments about the Avenal case. The Commission alleged that Judge Roe's conduct violated Canons 1 (a judge shall uphold the integrity and independence of the judiciary), 2 A (a judge shall respect and comply with the law), 2 B (a judge shall not lend the prestige of judicial office to advance the private interest of the judge or others), 3 A(3) (a judge shall be patient, dignified, and courteous to lawyers and others with whom the judge *1079 deals in an official capacity), and 3 A(8) (a judge shall not, while a proceeding is pending in any Louisiana state court, make any public comment that might reasonably be expected to affect its outcome or impair its fairness) of the Code of Judicial Conduct. The Commission further alleged that Judge Roe engaged in willful misconduct relating to his official duty and engaged in persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute, in violation of La. Const. art. V, § 25(C).
Judge Roe answered the Formal Charge and admitted his misconduct, but denied such was willful; rather, Judge Roe claimed that he acted "based on extremely poor judgment and stupidity." Elaborating upon his response to the OSC's letter of inquiry, Judge Roe explained that he discussed a number of general issues with the newspaper reporter, as well as the Avenal case and "the contrasting personalities" of the lawyers involved. For instance, they talked about Mr. Wilson's seersucker suits and Mr. Gauthier's more casual style of dress, Mr. Gauthier's malapropisms,[3] and about the more formal approach to the proceedings by Mr. Wilson as compared to Mr. Gauthier. Judge Roe and the reporter also discussed how this played to the jurya jury comprised of blue-collar, rural, non-professional people, most related in some way to the oyster industry. In that context, Judge Roe indicated that the major pre-trial issue was whether the State would fare better if the case were tried without a jury. This issue was also raised post-trial, when Judge Roe ruled on the State's motion for new trial, stating that he would not have made the same award as the jury, but that was not the legal basis for modifying the jury's award. Judge Roe also reiterated to Mr. Wilson the pre-trial discussions as to whether the State was better served by having a jury decide the case. Judge Roe did not discuss these rulings with the reporter but referred him to the transcripts.
Judge Roe also mentioned to the reporter that he teased and joked with all of the attorneys during the course of the trial, including Mr. Wilson and Mr. Gauthier, in an attempt to inject some humor and levity into the proceedings. This discussion was the source of the "teasing" and "harsh to all sides" comments in the newspaper articles.
Concerning his photograph in the first newspaper article, Judge Roe explained that he was told by the reporter that The Times-Picayune did not have a "stock" photograph of him without hair. The reporter asked if he could come by Judge Roe's office and take a photograph for "file" purposes. When he did, he first asked if he could photograph Judge Roe on his Harley-Davidson motorcycle, which Judge Roe refused. He then asked whether he could take a head and shoulders shot of Judge Roe in his judicial robe with the river in the background, to which Judge Roe agreed. He stated that none of the photographs were supposed to be full-length, and more importantly, that the Caernarvon Freshwater Diversion Project "cannot be seen in the photograph and there was no intention that the photograph would have that purpose."
With these explanations, Judge Roe stated:
. . . I ADMIT that my actions in meeting with and discussing this matter with a reporter for any purpose was wrong, in violation of the Canons of Judicial *1080 Conduct, and a matter of extremely poor judgment on my part. I regret having any discussion with the reporter about a pending matter, the embarrassment it has caused the judiciary and me personally, and the fact that the Times Picayune seized upon the interview to promote their agenda of merit selection of judges. I have no excuse for this extreme lack of judgment.

Joint Stipulation
On April 10, 2006, Judge Roe and the OSC jointly filed a "Statement of Stipulated Uncontested Material Facts, Stipulated Conclusions of Law, and Stipulated Recommendation of Discipline." The stipulation incorporated the underlying facts set forth above as well as Judge Roe's responses to the OSC's letter of inquiry and the Formal Charge. Based on these stipulated facts, the parties agreed that Judge Roe violated the Code of Judicial Conduct, for which misconduct the Commission should recommend a public censure and payment of costs. Specifically, the parties stipulated that Judge Roe violated Canon 3 A(8) because he made public comments about the Avenal case while it was pending on appeal that might reasonably be expected to affect its outcome or impair its fairness; violated Canon 2 A by failing to act at all times in a manner so as to promote public confidence in the integrity and impartiality of the judiciary; violated Canon 2 B's prohibition against lending the prestige of his judicial office to advance the private interest of the judge or others by posing for the photograph that accompanied the newspaper article; and violated Canon 1's dictates that a judge personally observe high standards of conduct so that the integrity and independence of the judiciary may be preserved when he publicly criticized an attorney appearing before him in a hotly contested case, made comments about the general anti-State bias of the citizens of Plaquemines Parish, and posed for a photograph.[4]
Judge Roe did not stipulate that he engaged in willful misconduct relating to his official duty and persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute, in violation of La. Const. art. V, § 25(C). While admitting that his conduct "was based on extremely poor judgment and stupidity" and that his conduct was public and prejudicial to the administration of justice, Judge Roe specifically denied that he engaged in "willful" misconduct and denied that he engaged in "persistent" conduct.
The Commission voted to accept the stipulated facts and legal conclusions presented by the parties, and to dispense with convening a hearing. Accordingly, the case was submitted to the court based solely upon the stipulations.

Prior Closed File
The Formal Charge and the stipulation between the parties also address a prior complaint involving Judge Roe in File No. 99-1686.[5] The file was opened by the Commission upon receipt of a complaint from Marie Giordano, a litigant in a case pending in Judge Roe's court. In her *1081 complaint, Ms. Giordano alleged that Judge Roe told a newspaper reporter that she is a convicted felon (a charge she denied), and that he later made the same remark to seven lawyers, including her own, during a telephone conference call. In January 2000, the Commission voted to close the file but cautioned Judge Roe to review Canon 3 A(8) of the Code of Judicial Conduct, "which prohibits public comments about pending cases that could affect the outcome or affect the fairness of the proceeding."
Judge Roe admitted that he was cautioned by the Commission but denied that the closed file has any relevance to the instant case. Judge Roe stated that he made comments on the record and to the attorneys involved in the case that Ms. Giordano, who had been found to have illegally misappropriated over a million dollars from class action members, would not have any further involvement as a class representative. Judge Roe denied that was a "public" comment which could or would affect the fairness of the proceeding; rather, it was made as an indication of how that particular matter would proceed.

FINDINGS OF THE COMMISSION
Applying the factors set forth in In re: Chaisson, 549 So.2d 259 (La.1989),[6] the Commission concluded as follows:
(a) and (b) While the Commission found that Judge Roe violated Canon 3 A(8) on the occasion giving rise to the Formal Charge, and he had engaged in earlier conduct that implicated violation of the same Codal provision, the members did not determine a pattern of misconduct. See (h) below;
(c) and (d) Judge Roe's misconduct occurred with respect to his official judicial duties;
(e) Judge Roe has acknowledged the facts, as alleged, and he has admitted that his actions were wrong and indicated "extremely poor judgment on his part." Judge Roe has admitted that he violated the Code of Judicial Conduct, but denies that he acted willfully;
(f) Judge Roe's reaction to the Formal Charge and his cooperation during the Commission proceedings suggest that he will modify his conduct in the future;
(g) Judge Roe was elected to the bench in 1990, and so he was not a new judge when the conduct which led to the stipulation occurred;
(h) There has been one prior complaint lodged against Judge Roe that resulted in a cautionary letter of counseling. With regard to the prior complaint, the Commission found that Judge Roe's conduct suggested a problem under Canon 3 A(8), by his having made public comments about a pending case. Judge Roe maintained that the prior factual scenario was different because there he made comments in open court about a litigant's involvement in other litigation. While the Commission does *1082 not necessarily agree with the distinction made by Judge Roe, the members did not find that the fact of this prior complaint enhances the recommended penalty that may be imposed;
(j) Of paramount concern to the Commission was that Judge Roe (1) granted an interview to the press, which led to a widely published article that potentially cast the judiciary as a whole into disrepute, and (2) publicly criticized an attorney who appeared before him in a hotly contested case. Judge Roe stipulated that he "teased" counsel, and certain members of the Commission commented upon the value of humor in an intense trial setting. However, the Commissioners are strongly of the opinion that judges should treat lawyers who appear before them with dignity and respect, all to maintain the public's confidence in the "integrity and impartiality of the judiciary." See Canon 2 A. For a judge to selectively criticize and malign one lawyer in a lawsuit may suggest partiality to the other side, particularly in the course of proceedings of political interest to many residents of the judge's district, as was the Avenal case. Further, the Commission found Judge Roe's being photographed in his judicial robes, as depicted in the New Orleans newspaper, indicative of his use of his judicial office for potential political purposes, in violation of Canon 2 B of the Code of Judicial Conduct.
The Commission did not find Judge Roe in bad faith, but agreed with him that his judgment was poor when he met with the press about the Avenal case. Considering the stipulations, including Judge Roe's agreement that he should be publicly censured, the Commission voted to make a recommendation of public discipline to the court.
Based on these considerations, the Commission recommended that Judge Roe be publicly censured and that he be ordered to reimburse and pay to the Commission $25.08 in hard costs.

DISCUSSION
Because Judge Roe and the Special Counsel have stipulated to the facts, including those in mitigation, the sole issue presented is the appropriate measure of discipline in this case. In re: Shea, 02-0643 (La.4/26/02), 815 So.2d 813; In re: Decuir, 95-0056 (La.5/22/95), 654 So.2d 687. In determining an appropriate sanction, we are mindful that the primary purpose of the Code of Judicial Conduct is to protect the public rather than discipline judges. In re: Harris, 98-0570 (La.7/8/98), 713 So.2d 1138; In re: Marullo, 96-2222 (La.4/8/97), 692 So.2d 1019.
As the Commission concluded, Judge Roe's decision to participate in a newspaper interview regarding a pending case led to a widely published article that potentially cast the judiciary as a whole into disrepute. Likewise, his public criticism of a lawyer in the Avenal lawsuit calls the judiciary's impartiality into question, especially considering the politically charged nature of the Avenal litigation. An experienced jurist such as Judge Roe should be well aware of the need to maintain public respect and confidence in an impartial judiciary.[7]
Nonetheless, we find the record supports the Commission's determination that Judge Roe did not act in bad faith in this matter and that he displayed sincere remorse for his actions. Good faith is not an affirmative defense to a judicial disciplinary charge; however, it may be considered as a mitigating factor which militates *1083 in favor of a lesser sanction. Marullo, 96-2222 at p. 7, 692 So.2d at 1023; Chaisson, 549 So.2d at 267.
Considering all these facts, we conclude the sanction of public censure is appropriate. Accordingly, we will accept the recommendation of the Commission and publicly censure Judge Roe, as well as order him to pay the costs of the proceedings.

DECREE
For the reasons assigned, it is ordered that Judge William A. Roe be publicly censured for violating Canons 1, 2 A, 2 B, and most particularly, 3 A(8) of the Code of Judicial Conduct (1996). It is further ordered that Judge William A. Roe reimburse the Judiciary Commission of Louisiana the sum of $25.08.
NOTES
[1] A companion case, Alonzo v. State of Louisiana, was filed by oyster fisherman in St. Bernard Parish.
[2] Specifically, the transcript reflects the following comments by Judge Roe in denying the State's motion for new trial:

And ... of course, the Court's first reaction to the size of the judgment was some amazement. Certainly, the judgment was much, much larger than I would have granted had I been hearing the case in lieu of a Jury. But, that is not the basis for the granting of a new trial. There was an extensive amount of evidence presented to the Jury on the issue of the value of the oyster leases taken by this inverse condemnation.... In short, there was evidence presented at this trial, competent reasonable evidence upon which the Jury's findings was based.... [B]ased on this record having presided over the trial, the Court is convinced that there was a basis upon which the Jury could make a determination on all of the issues presented.
[3] For example, Judge Roe mentioned that Mr. Gauthier repeatedly referred to oysters as "orgasms" instead of "organisms," which became a source of constant amusement to the jurors and attorneys involved in the case.
[4] In light of these admissions, the parties pretermitted any stipulation as to whether Judge Roe's public criticism of an attorney appearing before him in a hotly contested case also violated Canon 3 A(3)'s dictate that he be patient, dignified, and courteous to lawyers and others with whom he deals in an official capacity.
[5] See Supreme Court Rule XXIII, § 3(d), which provides that "Closed files of prior proceedings against a judge may be referred to by the Commission at any stage of the current proceedings."
[6] In Chaisson, this court set forth a non-exclusive list of factors which may be considered in imposing discipline against a judge. These factors are as follows:

(a) whether the misconduct is an isolated instance or evidenced a pattern of conduct; (b) the nature, extent and frequency of occurrence of the acts of misconduct; (c) whether the misconduct occurred in or out of the courtroom; (d) whether the misconduct occurred in the judge's official capacity or in his private life; (e) whether the judge has acknowledged or recognized that the acts occurred; (f) whether the judge has evidenced an effort to change or modify his conduct; (g) the length of service on the bench; (h) whether there have been prior complaints about this judge; (i) the effect the misconduct has upon the integrity of and respect for the judiciary; and (j) the extent to which the judge exploited his position to satisfy his personal desires.
[7] We find it of particular concern that Judge Roe previously was cautioned in the Giordano matter against making public comments about a pending case.