933 So.2d 736 (2006)
In re Judge Tammy LEE.
No. 2006-O-0454.
Supreme Court of Louisiana.
July 6, 2006.
Office of Special Counsel, Steven R. Scheckman, Special Counsel, Diana A. Cross, Asst. Special Counsel, for Applicant.
Schiff Law Corporation, Leslie J. Schiff, Opelousas, Benjamin O. Burns, and Tammy D. Lee, Ruston, for Judge Tammy Lee.
*737 Nancy E. Rix, New Orleans, Commission Counsel.
VICTORY, J.
This judicial disciplinary proceeding was instituted by the Judiciary Commission of Louisiana ("Commission") against Judge Tammy D. Lee of the Monroe City Court, Division "A." Judge Lee assumed her office on January 1, 2001,[1] and she has served continuously since that time. This Court is vested with exclusive original jurisdiction in judicial disciplinary proceedings by La. Const. art. V, § 25(C).

FACTS AND PROCEDURAL HISTORY
By letter dated February 3, 2003, Judge Scott Leehy of the Monroe City Court, Division "B," submitted a complaint to the Commission concerning Judge Lee. Judge Leehy told the Commission that he had delivered a public records request to the administrator of the Monroe City Court and to Judge Lee seeking information regarding Judge Lee's travel expense reports, annual and sick leave reports, and reports of cases taken under advisement, among other things. Based upon his review of the documents produced, Judge Leehy concluded that Judge Lee submitted fraudulent public records of cases under advisement, failed to file expense reports in a timely manner, and failed to reimburse the court timely for travel monies advanced that were not used.[2] The Commission authorized an investigation into Judge Leehy's complaint, and Judge Lee was so notified by letter dated June 25, 2003.
Thereafter, in August 2004, the Legislative Auditor of the State of Louisiana issued a negative report regarding the manner in which Judge Lee accounted for and reimbursed the Monroe City Court for travel advances. The Legislative Auditor's investigation and report were the subject of extensive media coverage in the Monroe, Louisiana area.

Formal Charges
On November 16, 2004, the Commission filed two Formal Charges against Judge Lee in Nos. 0227 and 0228, alleging that Judge Lee failed to timely render judgments in eighteen specified cases for periods ranging from three months to nine months, and failed to timely report to the Judicial Administrator that the cases were taken under advisement. The Commission further alleged that these failures were the subject of a news report broadcast in the Monroe, Louisiana area. The Commission alleged Judge Lee's conduct violated Supreme Court General Administrative Rules Part G, § 2 and La. R.S. 13:4207.[3] In *738 addition, the Commission alleged Judge Lee's conduct violated Canons 1 (a judge shall uphold the integrity and independence of the judiciary), 2 A (a judge shall respect and comply with the law), 3 A(7) (a judge shall dispose promptly of the business of the court), and 3 B(1) (a judge shall diligently discharge her administrative responsibilities and maintain professional competence in judicial administration) of the Code of Judicial Conduct. Finally, the Commission alleged that Judge Lee engaged in willful misconduct relating to her official duty, engaged in willful and persistent failure to perform her duty, and engaged in persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute, all in violation of La. Const. art. V, § 25(C).[4]
On January 25, 2005, the Commission filed a Formal Charge against Judge Lee in No. 0232, addressing the irregularities in the manner in which Judge Lee accounted for and reimbursed the Monroe City Court for travel advances. The Commission alleged that these irregularities triggered negative findings in the Legislative Auditor's report and were the subject of extensive media coverage in the Monroe, Louisiana area. The Commission alleged Judge Lee's conduct violated La. Const. art. VII, § 14,[5] La. R.S. 42:1461(A),[6] *739 Supreme Court General Administrative Rules Part G, § 1(d),[7] and the travel policy of the Monroe City Court.[8] In addition, the Commission alleged Judge Lee's conduct violated Canons 1, 2 A, and 3 B(1) of the Code of Judicial Conduct. Finally, the Commission alleged that Judge Lee engaged in willful misconduct relating to her official duty, engaged in willful and persistent failure to perform her duty, and engaged in persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute, all in violation of La. Const. art. V, § 25(C).

Stipulated Facts and Conclusions of Law
On August 9, 2005, Judge Lee, through counsel, and the Office of Special Counsel ("OSC") jointly filed a "Statement of Stipulated Uncontested Material Facts and Stipulated Conclusions of Law." Among other stipulations, Judge Lee admitted *740 that she failed to perform her adjudicative and administrative duties in a timely and efficient manner by failing to issue judgments in eighteen specified cases for periods ranging from three months to nine months. Furthermore, Judge Lee agreed that she failed to timely and accurately report to the Judicial Administrator that these eighteen cases were under advisement. Although the cases were held under advisement for a period exceeding thirty days, none of them were ever reported to the Judicial Administrator as being under advisement or were not reported for every month they should have been. Judge Lee's failure to render timely judgments and failure to report to the Judicial Administrator were the subject of a news report broadcast by KNOE-TV, Channel 8, on August 30, 2004.
Based on these stipulated facts, Judge Lee and the OSC agreed that she violated La. R.S. 13:4207 and Supreme Court General Administrative Rules Part G, § 2, as well as Canons 1, 2 A, 3 A(7), and 3 B(1) of the Code of Judicial Conduct and La. Const. art. V, § 25(C), all as charged in Formal Charge Nos. 0227 and 0228.
As to Charge No. 0332, Judge Lee agreed that between January 1, 2001, and December 31, 2003, she went on 28 court-related business trips. For nineteen of the 28 trips at issue, Judge Lee owed the court money upon her return because the total amounts advanced to her, prepaid by the court, or charged to the court's credit card exceeded the total amount of reimbursable expenses incurred on the trip. For twelve of these nineteen trips, Judge Lee failed to file an expense report and to repay the court for advanced travel costs until after the end of the fiscal year in which the travel had occurred. For one of these trips, Judge Lee failed to repay the court for advanced travel costs and to file an expense report for more than 660 days after she returned from the trip. Judge Lee owed the court $451.99 for this trip and reimbursed the court $371.41. The delays for repaying the court and filing her expense reports along with the amounts overpaid to her for the other eighteen trips were as follows:
 One report filed more than 300 days after return, with a total of $2,128.88
 Two reports filed more than 240 days after return, with a total of $770.00
 One report filed more than 210 days after return, with a total of $87.59
 Five reports filed more than 180 days after return, with a total of $1,343.38
 One report filed more than 150 days after return, with a total of $564.39
 Two reports filed more than 120 days after return, with a total of $1,391.70
 Two reports filed more than 90 days after return, with a total of $912.82
 Three reports filed more than 30 days after return, with a total of $421.28
 One report filed less than 30 days after return, with a total of $148.66
For eight of these nineteen trips, Judge Lee charged some of the expenses to the court's credit card, despite the fact that she had received travel expenses to cover those expenses.
Between June 3, 2001 and May 31, 2003, Judge Lee took nine trips in which the total of the expenses incurred for the trip exceeded the amounts advanced, prepaid, or charged to the court's credit card. For eight of these nine trips, Judge Lee failed to file a travel reimbursement report within thirty days of returning from the trip.[9]
*741 Judge Lee's failures in these regards resulted in several negative audit findings by the Legislative Auditor, including the following paragraph on page three of the Legislative Auditor's report:
Judge Lee received advances totaling $4,479. After receiving these advances, Judge Lee charged $3,978 to the Court's credit card, thereby receiving duplicate payment for the same expenses. Judge Lee reimbursed the Court $1,672 of the duplicate payments more than 60 days after completion of the trips and $2,306 of the duplicate payments more than 180 days after completion of the trips.
On page four of the report, the Legislative Auditor stated:
Of the $8,669, Judge Lee reimbursed $7,685 in the following manner:
 $2,234 was reimbursed more than 30 days after returning from travel.
 $1,024 was reimbursed more than 90 days after returning from travel.
 $564 was reimbursed more than 120 days after returning from travel.
 $3,863 was reimbursed more than 180 days after the end of travel.
Also on page four, the Legislative Auditor stated:
Part G, Section 1(c)(1) of the Supreme Court's travel policy provides, in part, that the use of a rental vehicle is limited to situations where it is the most economical means of travel or unless there are extraordinary circumstances. This policy also provides that reimbursement for rental vehicles is to be limited to the rental cost of a mid-sized automobile.
* * *
Judge Lee rented vehicles on five occasions at a total cost of $1,818. Of this amount, $443 was for eight days of usage beyond days necessary for Court travel and $156 was for upgrading rental vehicles from mid-sized to SUV, premium, or full-sized.
If called to testify, the auditor who performed the audit of the Monroe City Court would testify that the documents included in the auditor's case file support the findings in the auditor's report, and that he/ she believes the findings are accurate.
Judge Lee's failures to timely reimburse the court for travel advances beyond the costs actually incurred and failures to timely file her travel reimbursement reports, which triggered the negative findings in the Legislative Auditor's report, were the subject of negative media attention from February 2004 to several weeks after the report was issued in August 2004, resulting in at least 23 newspaper articles and six broadcast news items.
Based on these stipulated facts, Judge Lee and the OSC agreed that she violated La. Const. art. VII, § 14, La. R.S. 42:1461(A), Supreme Court General Administrative Rules Part G, § 1, and the travel policy of the Monroe City Court. Judge Lee also agreed that she violated Canons 1, 2 A, and 3 B(1) of the Code of Judicial Conduct, as well as La. Const. art. V, § 25(C), all as charged in the Formal Charge. However, the parties could not agree upon a recommended penalty. Judge Lee submitted a memorandum to the Commission urging that the appropriate *742 sanction was a public censure, while the OSC argued that a 60-day suspension without pay was appropriate.

Formal Hearing
Thus, the Commission conducted a hearing on the Formal Charges on December 2, 2005. Prior to the hearing, the parties stipulated to the introduction of numerous exhibits and the only witness to testify at the hearing was Judge Lee. After considering her testimony, the Commission made additional findings of fact which are discussed below.
In her testimony before the Commission, Judge Lee was first questioned about why she delayed in rendering decisions for what appeared to be unreasonably long periods of time. Judge Lee testified that the rotation of her docket is a factor (for example, having one month on the civil docket, one month on the juvenile docket, and one month on the misdemeanor docket), as well as the fact that she had to be away from work on two occasions for emergency surgery during her first years as a judge. She also testified that she was overworked because for a period of time she was both the chief judge of the Monroe City Court and temporarily served as its clerk of court; she cited the complexity of some of the cases that were before her, particularly eviction and redhibition cases; and she claimed that she was very liberal in granting attorneys extensions of time to submit post-trial memoranda. Finally, she defended the delays as follows:
With the cases that I take under advisement, I'm very meticulous about the opinions. I want to make certain that every facet of the case is covered. Most judges would say, well, the easiest way to do it is simply rule from the bench. However, that was not the avenue that I decided to take when deciding cases. And we do not have a law clerk at the city court, so we are responsible for researching and compiling each of the cases. And I still do it the old fashioned way. I don't use West Law. I manually research and read books. I know most people think that that's outdated. But for each case, that's the procedure that I follow.
Judge Lee stated that depending upon the type of case in question, her research can take "anywhere from three to seven days if I'm able to solely work on that." Judge Lee also noted that she has never received a complaint from a litigant or from an attorney concerning the length of time that a particular case was being held under advisement.
Concerning the cases under advisement reports, Judge Lee testified that she was unaware of the monthly reporting requirement when she first took the bench in January 2001.[10] About three months later, the administrator of the Monroe City Court showed Judge Lee's secretary how the forms needed to be done, and the secretary began preparing the reports and submitting them with a facsimile of Judge Lee's signature.[11] Nevertheless, Judge *743 Lee took responsibility for the errors on her reports, stating that she should have made certain it was done correctly. Judge Lee assured the Commission that she now uses a tickler file and takes personal care to see that her monthly cases under advisement reports are timely and accurately submitted.
Turning to the travel reimbursements, Judge Lee testified that when she first took the bench, all of her travel arrangements were handled by the clerk of court, including the preparation of an expense report. Judge Lee was not aware that those reports had to be completed within any particular time frame, except that the court's internal auditor required they be done by the end of the fiscal year.[12] When asked to explain her practice of obtaining advance payment before going on trips and then charging the court's credit card for the same expenses, or delaying returning unneeded funds, Judge Lee testified:
. . . The primary problem that we had with expense reports was the lodging issue. That was the biggest problem which caused much of the delay. When I came to the court in 2001, one of the first things that the clerk wanted to do was for me to have a credit card that was issued in the name of Monroe City Court. I had been advised not to accept a credit card from the Monroe City Court, and I did not accept the card. So my travel was primarily by advances and/or reimbursements to the court.
When we left for tripsand the primary hotels where we encountered lodging problems were the Windsor Court, the Hotel Intercontinental, and there were a few others. Upon attempting to check into those hotels with the amount that the clerk had given or allotted for lodging, that amount was not sufficient because those hotels require you to submit an additional amount for incidentals, for dining or for bar, not saying that you're going to use those, but you cannot check into the hotel if you're paying with cash without posting an additional amount which was usually anywhere from $500 to $700.
She explained further that after experiencing difficulties with hotels,
. . . [I] decided that if we wereupon checking into the hotel, if they were going to assess an amount for incidentals, that we would use the court's general card. And it's at that point that we began traveling with the court's credit card. Prior to that time, I never traveled with the court's general card.
If they were going to assess an amount for incidentals, we used the card. Along with that, she had also given us the cash advance which was to cover lodging. The cash would be used if we were not going to be assessed an amount for incidentals. If we were going to be assessed, then the court's general card would be used.
Upon returning from the trip when we filled out our expense report, then the funds that had been given for the lodging would be returned to the court.
When questioned about how she returned funds to the court, Judge Lee testified as follows:
Q. Judge, did you ever purposely take any money belonging to the court that you wanted to convert to your personal use and expend in any way other than for court business?
A. No. Any funds that were ever given for lodging, if they were not assessed or *744 used for lodging were returned. And I think that is a point that has never been mentioned or in the stipulations. Once we returned from the trip, if the funds were not used for lodging, then they were turned back over to the court. They might bethe expense report might not have been filed at that time, but there were never funds that I carried around or that I used for personal use or loaned out or used as collateral. That was never the case.
. . .
Q. Ma'am, do you think you were doing everything in your power to see to it that the taxpayers' money was protected in terms of you separating your personal money from the court's money and you reimbursing public money back to the public fisc when it was due back? Do you believe you did all that you had in your power to do?
A. I never co-mingled my personal cash with the court's cash. I never did that.
. . .
Q. You mean the accountant could just hold money in the drawer or something until you did the paperwork?
A. Or check or a money order until we did the paperwork on it, yes.
Q. An so sometimes it took you as much as two years to do the paperwork?
A. The paperworkand I need to clarify that. It did not take two years to do an expense report. Some of the reports had to be amended or revised because of errors that may have been in there.
. . .
A. . . . We have a safe in our office, and that's where the money was at all times.
Q. So it really was still in your possession. It wasn't returned to the court. It's in your possession, isn't it, Judge? I mean, I don't want to belabor this point. But it seems to me that if you're holding on to money that's public money that's not yours and it's in your possession, how is it that we're expected to believe or to understand that your position today is that you're saying I returned the money 
A. Well, the money 
Q. the stipulation is incorrect?
A. I did return the money.
Q. Who did you return it to if you kept it in your safe?
A. The money was returned in that the business manager was aware that it was there. She had to be aware. The clerk was aware. Everyone was aware that the money was there pending the final resolution of the expense report. The reasons that we had to start doing that is because previously there were funds that were returned aside from the final expense report, and those funds came up missing and no one knew where they were. So that's where the rule came that when you submitted the expense report, then you would remit the funds along with the expense report. There was never money that was in my personal possession.
Judge Lee represented to the Commission that her difficulties with travel ceased on February 18, 2004, when she learned for the first time of the Monroe City Court's travel policy.[13] Thereafter, Judge Lee worked to improve the policy so that it "directly spoke to the time period within *745 which reports, advances or reimbursements had to be made."
Finally, Judge Lee expressed regret for the extensive media coverage of her conduct:
Our media at home has punished me for not responding to them. From day one when this came down from the Legislative Auditors, I would daily get messages and wouldmessages would be left with my secretary to please let me know that it will all go away if she'll just talk to us. However, I respected my position and the court enough to know that that was not the thing to do, to covet with the media, because I knew what would be the outcome.
So everyday for at least a six- or seven-month period, although it was the same story each day, the media would add a little more for ratings or for whatever purpose it was. But never did I correspond. If we got a public records request, of course I had to submit the information. But I never spoke with the media about any of the matters that we are here for today. [emphasis added]

Conclusions of Fact and Law Found by the Commission
Before rendering its recommended sanction, the Commission made additional findings based on Judge Lee's testimony. The Commission believed that the delays experienced by litigants before Judge Lee were attributable to her own inefficiency, which under In re Tuck, 96-1444 (La.11/25/96), 683 So.2d 1214, are indefensible.[14] Further, while the Commission did not criticize her for trying to do the right thing insofar as finding facts and applying the law, they noted that if she chose to take extra time to confirm the accuracy of her work, she should have foregone taking so many out of town trips (admittedly taken during the applicable period), stayed home, and rendered her cases on a faster track.
As to her failure to report cases under advisement, the Commission found that the record demonstrates that she filed such reports beginning with her first month on the bench, indicating her knowledge of the rule.
As to Charge No. 0232, the Commission members could not accept Judge Lee's explanations for why she delayed in making travel reimbursements after the first few months, when she said she experienced problems with hotels requiring that she post a credit card for incidental costs. Once she began to use the credit card for a portion of her hotel expenses, despite her initial reluctance to have a court credit card used for her travel, there was no reason not to use it for the entire bill. This would have eliminated the elaborate procedures she used (and the resulting unnecessary delays in rendering an accounting) in terms of obtaining advances, using the credit card, then having to reconcile amounts expended that were attributed to a cash advance. Further, Judge Lee specified problems with a few hotels, which left open the question why she did not just stay at another facility. Judge Lee adamantly maintained that she did not know her court had a travel policy until February 2004, even though the clerk of court referenced that policy in a memo sent to Judge Lee in November 2002. The Commission could not accept Judge Lee's assertions that she had never seen the clerk's memo until the Legislative Auditor showed it to her. The Commission believed *746 that she may not have read it, but that she received it. Further and significantly, even if Judge Lee's testimony is accepted in full that she thought she was in compliance with her court's travel expense reimbursement policy by submitting all outstanding expense reports by the end of the court's fiscal year, by her own admission, the Commission found that Judge Lee was not in compliance twelve times out of the 28 times such reports were required. The Commission found bad faith on Judge Lee's part "considering the record of how she eventually began to seek advance funds and then charge large duplicative amounts on the court credit card, which occurred late in the applicable period."
Regarding her testimony about the media coverage, a Commission member noted that this testimony was not entirely accurate because Judge Lee granted an interview to a Monroe newspaper, The Free Press. The Commission members were troubled by the fact that Judge Lee gave this interview to The Free Press that was published in May 2004, wherein she reportedly told the reporter her court never had a travel policy. This was untrue, and by May 2004, she admittedly knew of the policy. While her interview with the newspaper was not sworn testimony, this discrepancy reflected to the Commission that Judge Lee has not always been truthful about the issue of the Monroe City Court's travel policy. Further, at the hearing, the Commission members noted that Judge Lee gave complicated answers to direct questions, and such responses were either not responsive or they were not completely accurate when compared to other evidence in the record.
The Commission concluded, as stipulated to by Judge Lee, that Judge Lee's conduct violated Part G, §§ 1 and 2 of the General Administrative Rules of the Louisiana Supreme Court, Art. VII, § 14 of the Louisiana Constitution, La. R.S. 13:4207, La. R.S. 42:1461(A), and Canons 1, 2 A, 3 A(7) and 3 B(1) of the Code of Judicial Conduct. The Commission further found that her conduct constituted willful misconduct relating to her official duty, willful and persistent failure to perform her duty and persistent and public conduct prejudicial to the administration of justice that brings the justice system into disrepute, in violation of La. Const. art. V, § 25(C).

Recommendation of Discipline by the Commission
In the stipulations submitted, Judge Lee suggested to the Commission that a public censure be the discipline imposed by the Court. The Office of Special Counsel recommended that Judge Lee be suspended without pay for sixty days. In recommending discipline, the Commission looked to the factors set forth by this court in In re: Chaisson, 549 So.2d 259 (La.1989). After considering the reported cases decided by this Court concerning a judge's violation of the rules that require timely decision making and accurate and timely reporting to the Supreme Court as to cases taken under advisement,[15] and based upon the large number of delinquent cases, compounded by Judge Lee's deficient reporting procedures, the Commission concluded that a suspension without pay is warranted. The Commission further noted that misconduct based upon failure to follow travel and reimbursement procedures presented an ethical issue of *747 first impression in this state. The Commission deemed negligence and inefficiency in handling public dollars as gravely serious, and warranting a suspension without pay, standing alone. Finally, what the Commission viewed as evasive testimony at the hearing constituted an aggravating circumstance sufficient to enhance the discipline. Taking into account all of these factors, the Commission recommended that Judge Lee be suspended without pay for 120 days, as well as ordered to reimburse and pay to the Commission $974.70 in costs.

DISCUSSION
Judge Lee has stipulated that her conduct violated Part G, §§ 1 and 2 of the General Administrative Rules of the Louisiana Supreme Court; La. Const. Art. VII, § 14, La. R.S. 13:4207, La. R.S. 42:1461(A); and Canons 1, 2 A, 3 A(7), and 3 B(1) of the Code of Judicial Conduct and that her conduct constituted willful misconduct relating to her official duty, willful and persistent failure to perform her duty, and persistent and public conduct prejudicial to the administration of justice that brought the judicial office into dispute, in violation of La. Const. art. V, § 25(C). Thus, the only issue for this Court to determine is the appropriate discipline. In re: Decuir, 98-0056 (La.5/22/95), 654 So.2d 687, 692; see also In re: King, 03-1412 (La.10/21/03), 857 So.2d 432; In re: Parro, 03-0792 (La.5/2/03), 847 So.2d 1178; In re: Shea, 02-0643 (La.4/26/02), 815 So.2d 813; In re: Harris, 98-0570 (La.7/8/98), 713 So.2d 1138.
In re: Chaisson, supra at 266, described the following non-exclusive factors to be used in determining the appropriate sanction in a judicial discipline matter:
(a) whether the misconduct is an isolated instance or evidenced a pattern of conduct; (b) the nature, extent and frequency of occurrence of the acts of misconduct; (c) whether the misconduct occurred in or out of the courtroom; (d) whether the misconduct occurred in the judge's official capacity or in his private life; (e) whether the judge has acknowledged or recognized that the acts occurred; (f) whether the judge has evidenced an effort to change or modify his conduct; (g) the length of service on the bench; (h) whether there have been prior complaints about this judge; (i) the effect the misconduct has upon the integrity of and respect for the judiciary; and (j) the extent to which the judge exploited his position to satisfy his personal desires.
The application of the Chaisson factors to the facts of this case supports a 120-day suspension.

(a) and (b) Whether the conduct is an isolated instance or evidenced a pattern of conduct and the nature, extent and frequency of occurrence of the acts of misconduct.
Judge Lee's conduct, regarding both the cases under advisement and the travel expenses, evidenced a pattern of misconduct. For a period greater than two years, she had eighteen unreported cases under advisement and she failed to properly handle travel reimbursements and expenses for almost three years. The fact that she violated the rules for the vast majority of the trips taken indicates a pattern of misconduct.

(c) and (d) Whether misconduct occurred in or out of the courtroom and whether the misconduct occurred in the judge's official capacity or in his private life.
Clearly, Judge Lee's misconduct occurred in her official capacity as City Court judge.

*748 (e) Whether the judge has acknowledged or recognized that the acts occurred.
By stipulating to the uncontested material facts and conclusions of law in this case, Judge Lee has acknowledged that the alleged acts occurred and constitute violations of law. However, as found by the Commission, while she purported to accept responsibility for her conduct, she repeatedly blamed staff when she testified at her hearing. With regard to cases under advisement reports, she told the Commission she had left preparation and filing of those reports to staff, who would place her signature on the reports with a rubber stamp. As to the travel reimbursements, Judge Lee said she had left it up to staff to handle them, and when asked about the stipulated exhibit, a memo dated November 2002, wherein the Clerk of Court asks her to submit reports and comply with the travel policy, Judge Lee testified she had not seen it until it was produced by the Office of Special Counsel, although she admitted she knew the contents of the memo from another source. Most troubling, however, is the fact that she insisted that she had returned the travel advances and overpayments by keeping them in a safe behind her desk, and that therefore, her only violation was failing to turn in the expense reports timely.

(f) Whether the judge has evidenced an effort to change or modify his conduct.
Judge Lee has indicated that she has modified her conduct and will not commit further ethical violations. Specifically, she testified that she now uses a "tickler file" to avoid delays in deciding cases and that, as Chief Judge, she made sure that a clear policy was enacted for that court regarding travel expenses and reimbursements. Further, since the enactment of this policy in 2004, there have been no reported violations of this policy by Judge Lee.

(g) The length of service on the bench.
Judge Lee took the bench January 1, 2001, and thus was a new judge when some of the ethical misconduct occurred. However, as the Commission noted, by the second year of her term, she should not have remained in violation of rules about timely deciding cases and timely and accurately reporting cases under advisement. The same can be said of the travel expenses, especially given that the more serious violations occurred from mid-2002 through 2003. Further, no amount of judicial experience whatsoever is needed to know that (1) if the state provides you with public funds to cover court-related expenses, you cannot also charge the same expenses on the court credit card, and (2) that when you return from a trip in which you did not spend all of the public funds advanced to you for that trip, you have an obligation to turn that money back over to the court within a reasonable time after your return.

(h) Whether there have been prior complaints about this judge.
Other than the present complaints, there have been no prior closed complaints lodged against Judge Lee.

(i) The effect the misconduct has upon the integrity of and respect for the judiciary.
The decisional delays give the impression that relief through the court system cannot be achieved in an efficient and timely manner, and this impinges on the integrity and respect for the judiciary. However, Judge Lee's handling of her travel expenses is by far the most egregious aspect of Judge Lee's admitted conduct, and has the most detrimental effect on the integrity of and respect for the judiciary. As found by the Commission:

*749 the public can be expected to believe that judges withdraw funds from their courts and use them for personal reasons. Some might form the opinion that judges do not believe the rules apply to them, even though judges enforce the rules of law on the public. At best, citizens will perceive that judges can neglect their administrative responsibilities. At worst, the impression may be that there was a selfish or sinister motive for Judge Lee to retain the unused travel funds in her office for an extended period. Even those persons who do not suspect anything untoward as to Judge Lee's motives will nevertheless realize that sorely needed public funds were tied up, and not available for public usage. While judges must meet an hourly quota of continuing legal education and new judges are often ordered to attend an orientation session, most of the trips Judge Lee took could not have been mandatory, considering the large number at issue.[16] The Commission believes that if she chose to travel away from her court, and notably, she did so almost monthly during the period in question, she had a heightened duty to account accurately, timely, and in accordance with her court's travel policy, which she did not do. That these transgressions received extensive media attention significantly undermined the judicial process in this state.

(j) the extent to which the judge exploited his position to satisfy his personal desires.
Judge Lee argues that she did not retain the public funds to her advantage, and that there was no finding of commingling by Judge Lee or of misuse by Judge Lee of public funds. Accordingly, she argues that the only issue regarding the travel expenses was the timeliness of her completion of the reimbursement reports, which she regrets were not filed timely.
We disagree. Let there be no mistake about what Judge Lee was charged with, and what she stipulated to: her conduct violated La. Const. art. VII, § 14, which prohibits funds of the state from being loaned, pledged or donated to any person, and La. R.S. 42:1461(A), which prohibits a state official from misappropriating, misapplying, converting, misusing, or otherwise wrongfully taking public funds. For nineteen of the 28 trips at issue, Judge Lee owed the court money upon her return because the total amounts advanced to her, prepaid by the court, or charged to the court's credit card exceeded the total amount of reimbursable expenses incurred on the trip. For 12 of those 19 trips, she failed to repay the court for advanced travel costs until after the end of the fiscal year in which the travel occurred. For one of those trips, the delay in repayment to the court was 660 days. For eight of those trips, she charged some of the expenses to the court's credit card, despite the fact that she had received travel expenses to cover those expenses.
Judge Lee's testimony at the hearing that she actually did repay the court immediately because she put the monies owed to the court for her travel expenses in a safe in her office is ridiculous. Not only is this testimony highly suspect given that she repaid the court with money orders she obtained at some later time, it is an unacceptable defense. This Court long ago rejected this so-called "black box defense" *750 in attorney discipline cases in charges of improper use of client funds. LSBA v. Krasnoff, 488 So.2d 1002 (La. 1986) (keeping client's settlement proceeds in a safe deposit box, instead of giving the funds to the client, created a "presumption of embezzlement," and was not a defense to a charge of commingling). We likewise reject this defense in judicial discipline cases.
Regarding the appropriate discipline for the decisional delay, in addition to the Chaisson factors, this Court has cited several other factors in considering whether and how to impose a sanction. Tuck, supra at 1218; Wimbish, supra at 1187. These factors are:
(1) the amount of delay from the date the case was ripe for decision; (2) the complexity of the case; (3) the administrative and judicial workload of the judge; (4) the number of special assignments given to the judge; (5) the amount of vacation time taken; and (6) other complaints involving delayed decisions made against the judge.
Id. (citing In re: King, 184 W.Va. 177, 399 S.E.2d 888 (1990)). The Tuck court explained that sanctions, in cases of judicial decisional delay cases, have been imposed in cases involving:
(1) a substantial number of delayed decisions; (2) small number of delayed decisions involving particularly long delays; and (3) proof of vindictive or other malicious motive behind an instance of delay. When there are only one or two cases of delay, the courts generally have declined to sanction a judge, absent some other type of misconduct or aggravating circumstance.
Id. (citing Jeffrey M. Shaman, et al., Judicial Conduct and Ethics, § 6.05 (2d ed.1995)). In this case, compounding and aggravating her decisional delay was the failure to report any of the delayed cases as under advisement. In Wimbish, this Court concluded that the judge's failure to comply with the Court's reporting requirements was misconduct:
La. Sup.Ct. Rule G, § 2(b), which requires judges to report the status of cases pending beyond the established time period, was intended to provide a system of accountability and to promote the orderly and expeditious disposition of all matters submitted to a judge. It is imperative that those responsible for administering the judicial system be furnished this information timely. Therefore, we view the reporting requirement as a necessary duty, which we expect to be followed.
733 So.2d at 1188. Indeed, repeatedly failing to report cases under advisement when they are undecided is indicative of dishonesty on the part of a judge. In re: Sharp, 03-2256 (La.10/29/03), 856 So.2d 1213, 1215.
While discipline is certainly appropriate for these decisional delays and her failure to report them as under advisement, the most egregious and serious violations concern Judge Lee's handling of her travel expenses. This Court's General Administrative Rules contain stringent requirements for a judge requesting reimbursement of or payment for travel expenses incurred or to be incurred in attending a court-related meeting. See La. Supreme Court Rules, Part G, § 1. The Rules require that in order to be reimbursed for travel expenses, among other requirements, the judge must submit an itemized voucher for the actual travel expenses incurred, together with the required original receipts, invoices, and other required supporting documentation. Claims for reimbursement must be submitted no later that the tenth day of the month following the month in which the travel was incurred. While there is no express time limit in the Rules for returning unused advanced public *751 funds, the funds must be returned within a reasonable period. Further, even when all the public funds advanced are actually used for an appropriate purpose according to the Rules, the judge must still account for these funds by providing an itemized statement for the actual travel expenses incurred, together with the required original receipts, invoices, and other required supporting documentation. See La. Supreme Court Rules, Part G, § 1(d), 1.3(c). The delays for returning and accounting for the public funds in this case are far from reasonable. Finally, obtaining advances for travel expenses, then charging the same expenses to the court credit card, and, most incredibly, waiting months or even years to return the unused money is completely unacceptable. We conclude that Judge Lee's handling of her travel expenses, along with her delay in deciding cases and failing to report these cases as under advisement, as charged by the Commission, and as stipulated and testified to by Judge Lee, warrants the recommended 120-day suspension in this case.

DECREE
For the foregoing reasons, it is ordered that Judge Tammy D. Lee be, and she hereby is, suspended from judicial office for 120 days without pay. It is further ordered that Judge Lee reimburse and pay to the Judiciary Commission costs in the sum of $974.70 incurred in the investigation and prosecution of her case, pursuant to Supreme Court Rule XXIII, § 22.
RESPONDENT SUSPENDED, 120 DAYS WITHOUT PAY, AND CAST FOR COSTS.
WEIMER, J., dissents as to the discipline imposed and assigns reasons.
WEIMER, J., dissenting as to the discipline imposed.
I agree with the majority that substantial discipline is warranted.
I dissent because I believe that the misuse of public funds, when coupled with a finding by the Judiciary Commission of a lack of credibility on the part of Judge Lee, should result in more severe discipline being imposed.
In a 36-month period, Judge Lee went on 28 court-related business trips.[1] For 19 of the 28 trips, Judge Lee owed the court money because the total funds advanced to her, prepaid by the court, or charged to the court's credit card, exceeded the total amount of reimbursable expenses incurred on the trips.
The numerous trips, when coupled with the numerous instances of charging expenses to the court's credit card despite the fact Judge Lee had received advances to cover those same expenses, evidences a system of misusing public funds. Her retention of the funds for extended periods of time corroborates a determination that the public funds were being misused. The auditor referred to this system as "receiving duplicative payment for the same expenses." In the aggregate, as determined by the legislative auditor, Judge Lee incurred $3,978 in credit card expenses that duplicated the amounts advanced.
Her excuses for failing to repay the public funds ring hollow and untrue even when reviewing the cold record. The Judiciary Commission found her attempts at explanation to be unworthy of belief.
The Judiciary Commission repeatedly questioned Judge Lee's veracity. For example, the Judiciary Commission rejected Judge Lee's explanations relative to her *752 failures to make travel reimbursements timely. In particular, the Commission rejected Judge Lee's contention that difficulties with hotel payment caused the delay. The Judiciary Commission stated:
Once she began to use the credit card for a portion of her hotel expenses, despite her initial reluctance to have a court credit card used for her travel, there was no reason not to use it for the entire bill. This would have eliminated the elaborate procedures she used (and the resulting unnecessary delays in rendering an accounting) in terms of obtaining advances, using the credit card, then having to reconcile amounts expended that were attributed to a cash advance. Further, Judge Lee specified problems with a few hotels, which left open the questionwhy not just stay at another facility? Judge Lee's articulated reasons for her methods defied reason. (Emphasis supplied.)
La. Judiciary Commission Report, p. 28.
Additionally, the Judiciary Commission refused to accept Judge Lee's contention that she lacked knowledge about her court's travel policy until February 2004:
The Commission could not accept Judge Lee's assertions that she had never seen the clerk's memo until the auditor showed it to her. The Commission believed that she may not have read it, but that she received it. Further and significantly, even if Judge Lee's testimony is accepted in full that she thought she was in compliance with her court's travel expense reimbursement policy by submitting all outstanding expense reports by the end of the court's fiscal year, by her own admission, Judge Lee was out of compliance 12 times, out of the 28 times such reports were required.
La. Judiciary Commission Report, p. 28.
The Judiciary Commission refused to accept Judge Lee's testimony at the hearing:
Further, at the hearing, the Commission members noted that Judge Lee gave complicated answers to direct questions, and such responses were either not responsive, or they were not completely accurate when compared to other evidence in the record.
The manner in which she testified left Commissioners skeptical about the truthfulness of some of her assertions. An example would be when Judge Lee was adamant that she did not speak to the press about the work of the Legislative Auditor as to her travel expense issues. However, when questioned about Exh. 40, she then said that she had spoken to this other [news] paper. This kind of assertion was common during her hearing testimony, and Judge Lee only qualified such statements when asked about some other evidence that seemed contradictory.
La. Judiciary Commission Report, pp. 28-29.
The Judiciary Commission reported: "Judge Lee has acknowledged her errors and has attributed some of them to the fact she was a new judge when they occurred; however, while Judge Lee said she accepted responsibility for her conduct, she seemed to blame staff when she testified at her hearing." La. Judiciary Commission Report, p. 30. The Judiciary Commission stated:
With regard to cases under advisement reports, she told the Commission she had left preparation and filing of those reports to staff, who would place her signature on the reports with a rubber stamp. As to the travel reimbursements, Judge Lee said she had left it up to staff to handle them, and when asked about the stipulated exhibit, a memo dated November 2002, wherein the *753 Clerk of Court asks her to submit reports and comply with the travel policy, Judge Lee testified she had not seen it until it was produced by the Office of Special Counsel, although she admitted she knew the contents of the memo from another source.
La. Judiciary Commission Report, p. 30.
The Judiciary Commission further found:
[T]he impression may be that there was a selfish or sinister motive for Judge Lee to retain the unused travel funds in her office for an extended period . . . . While judges must meet an hourly quota of continuing legal education and new judges are often ordered to attend an orientation session, most of the trips Judge Lee took could not have been mandatory, considering the large number at issue.
La. Judiciary Commission Report, p. 31.
The Judiciary Commission also stated:
Insofar as Charge 0232 is concerned, the Commission finds Judge Lee in bad faith. During the time Judge Lee was a new judge she should have determined the manner in which she preferred to handle her travel arrangements. The misconduct occurred as she matured in the job and after she had taken numerous trips. On the one hand, it was ethical misconduct not to file expense reports timely, whether or not money should have been reimbursed, as required by the Court's own policy. That policy was clearly in effect and pointed out to her in writing by the clerk of court. However, considering the record of how she eventually began to seek advance funds and then charge large duplicative amounts on the court credit card, which occurred late in the applicable period, the Commission finds bad faith. This is the "double dipping" that was criticized by Judge Farr [who filed a complaint].
La. Judiciary Commission Report, p. 32.
The Judiciary Commission concluded:
Finally, what the Commission viewed as evasive testimony [by Judge Lee] at the hearing constituted an aggravating circumstance sufficient to enhance the discipline.
La. Judiciary Commission Report, p. 33.
In sum, the Judiciary Commission found Judge Lee's explanations "defied reason" and were unbelievable. She "gave complicated answers to direct questions" which were "not responsive" or "not completely accurate." The Judiciary Commission was "skeptical about the truthfulness" of her assertions. She "seemed to blame staff" and was found "in bad faith" and offered "evasive testimony." All of this served as an aggravating circumstance resulting in enhanced discipline.
Judge Lee stipulated her conduct violated La. Const. art VII, § 14, which prohibits funds of the state from being loaned, pledged, or donated to any person, and La. R.S. 42:1461(A), which prohibits a state official from misappropriating, converting, misusing, or otherwise wrongfully taking public funds.
When one couples Judge Lee's admitted violations with the Judiciary Commission's findings regarding a lack of truthfulness in her explanations, there can be but one conclusionthis matter involves a serious and systematic misuse of public funds.
While I agree with the Judiciary Commission and the majority that substantial discipline is required, I dissent because I believe the discipline imposed is inadequate based on the misuse of public funds *754 and her lack of credibility at the hearing before the Judiciary Commission.
NOTES
[1] Judge Lee was elected to fill the vacancy created by the removal from office of Judge Larry Jefferson. See In re: Jefferson, 99-1313 (La.1/19/00), 753 So.2d 181.
[2] Retired Judge Robert Farr also complained to the Chief Executive Officer of the Commission about Judge Lee by letter of October 29, 2004. Judge Farr claimed that Judge Lee would "double dip" by "going to all kinds of seminars and stuff and then using a credit card" for the same expenses, a situation which he described as "absolutely horrible."
[3] La. R.S. 13:4207 and Supreme Court General Administrative Rules Part G, § 2 both relate to cases taken under advisement. La. R.S. 13:4207 provides in pertinent part that district judges and the judges of the city courts "shall render judgments in all cases taken under advisement by them, within thirty days from the time the cases are submitted for their decision." The court's rule provides as follows:

(a) When Submitted. A case or other matter shall be considered as fully submitted for decision to the trial judge, and should be decided, immediately upon the conclusion of trial or hearing, and judgment signed expeditiously thereafter.
In an exceptional case when the record has been left open upon the conclusion of trial or hearing for the filing of testimony by deposition and/or documents, such depositions and/or documents shall be filed within fifteen days and the case or matter shall be considered as fully submitted, and should be decided, immediately after such filing or the lapse of fifteen days, whichever occurs sooner.
If the court, in an exceptional case, orders post-trial or post-hearing briefs, or orders the transcript prepared, plaintiff shall be allowed a maximum of twenty days within which to file a brief; defendant shall be allowed a maximum of twenty days from the filing or lapse of time for filing plaintiff's brief (whichever occurs sooner) within which to file a brief. If the defendant timely files a brief, plaintiff shall be allowed a maximum of ten days to file a rebuttal brief. When briefs are so ordered, the case or matter shall be considered fully submitted on the day following the day of the latest timely filing of a brief or, at the latest, the day following the last day for filing of briefs. The judge may extend the time for filing a brief for a reasonable period not to exceed the original time granted.
If a transcript of the evidence, in an exceptional case, is deemed essential and is ordered by the court, it shall be filed within thirty days following the conclusion of trial or hearing. When necessary, for good cause shown, one extension may be granted by the judge not to exceed an additional fifteen days for filing of the transcript.
(b) Reports. Each judge of a district, juvenile, family, parish, city municipal or traffic court shall report to this court, through the office of Judicial Administrator, on or before the tenth day of each month, all cases which have been fully submitted and under advisement for longer than thirty days, together with an explanation of the reasons for any delay and an expected date of decision.
[4] La. Const. art. V, § 25(C) providers in pertinent part as follows:

On recommendation of the judiciary commission, the supreme court may censure, suspend with or without salary, remove from office, or retire involuntarily a judge for willful misconduct relating to his official duty, willful and persistent failure to perform his duty, persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute, conduct while in office which would constitute a felony, or conviction of a felony . . .
[5] La. Const. art. VII, § 14 provides in pertinent part as follows:

(A) Prohibited Uses. Except as otherwise provided by this constitution, the funds, credit, property, or things of value of the state or of any political subdivision shall not be loaned, pledged, or donated to or for any person, association, or corporation, public or private.
[6] La. R.S. 42:1461(A) provides in pertinent part as follows:

Officials, whether elected or appointed and whether compensated or not, . . . by the act of accepting such office or employment assume a personal obligation not to misappropriate, misapply, convert, misuse, or otherwise wrongfully take any funds, property, or other thing of value belonging to or under the custody or control of the public entity in which they hold office or are employed.
[7] The parties have stipulated that this rule is, by its terms, applicable to city court judges even without an order of the local court adopting it. Supreme Court General Administrative Rules Part G, § 1(d), entitled "Limitation of Reimbursement or Payment of Travel Expenses," provides:

The judges of each court of appeal, judicial district court, juvenile court, family court, parish court, city court, municipal court, and traffic court may otherwise adopt more restrictive travel regulations to control the reimbursement or payment of public funds for travel expenses for meetings. Each court's travel regulations shall be submitted for information purposes to the Supreme Court and to the auditor(s) of relevant public funds. No reimbursement or payment of travel expenses from any public funds will be permitted unless reimbursement or payment is in compliance with this Section or with the travel regulations of the court on which that judge is presiding.
Whenever federal or private funds are available for the expenses of a meeting, as defined in this Section, whether such funds are in the form of payment for or reimbursement of the expenses or an honorarium for participation in the meeting, the judge should seek to obtain such funds. Thereafter, the judge may either (1) apply these funds first to the expenses and then seek reimbursement from other public funds only to the extent that the expense reimbursement under this Section exceeds the amount already received, or (2) may seek partial or full payment or reimbursement first from other public funds and then, upon receipt of the federal or private funds, remit the federal or private funds to the administrator of the pertinent public fund. In no event shall a judge obtain duplicate reimbursement or payment for the same travel expense from more than one source, public or private. The requests for reimbursement or payment of travel expenses shall provide an itemized voucher for the actual travel expenses incurred, together with the required original receipts, invoices, and other required supporting documentation.
Part G, §§ 1, 1.1, and 1.3 contain the rules governing travel expenses for state court judges.
[8] En Banc Order 00-EB5 of the Monroe City Court, adopted July 7, 2000, provides in pertinent part that "all travel expenses incurred by the judges and staff of Monroe City Court are governed by the mandates of Part G, General Administrative Rules of the Supreme Court of Louisiana." Aside from Part G, § 1(d) as cited above, § 1.3(d) provides:

(d) Time Requirements. The time periods for which claims for reimbursement are sought under this Section shall cover from the first day of the month to the last day of the month and shall be submitted to the Judicial Administrator no later than the tenth day of the following month.
[9] For these eight trips, the time delays were as follows:

 One report was filed more than 120 days after the trip
 One report was filed more than 90 days after the trip
 Two reports were filed more than 60 days after the trip
 Four reports were filed more than 30 days after the trip
The travel expense report for one of these nine trips was filed after the end of the fiscal year in which the trip occurred.
[10] In response to the questions of a Commission member, Judge Lee agreed that she did go to "New Judges School" when she first took the bench, and that she received "a thick volume of materials" at the two-day course, which included information about the cases under advisement reports. However, Judge Lee stated, "Honestly, there was so much information given to us at that conference to take in. And they did speak about it to us at the conference, but I neglected to take care of that or to follow through with that when I returned to the court."
[11] The Commission noted, however, that Judge Lee did file cases under advisement reports for the first three months she was on the bench. The signatures on the forms appear to be original, as opposed to the rubber stamp signature, which can be detected for the first time with the April 2001 report.
[12] On cross-examination, Judge Lee acknowledged that some of her expense reports were not submitted by the end of the fiscal year, but she characterized those as "trouble-shoots or trouble reports."
[13] Judge Lee admitted that the travel policy had been adopted in July 2000, but she pointed out that was prior to her arrival at the court. Moreover, the travel policy was referenced in a memo sent to Judge Lee by the clerk of the Monroe City Court in November 2002; however, Judge Lee maintained that she never received the memo.
[14] Although some decisional delays are defensible, the indefensible delays are "nonstructural inefficiency (i.e., delay attributable to a judge's own inefficiency), belligerence or spite, disability or infirmity, and sloth or neglect."
[15] The cases referred to by the Commission include In re: Tuck, supra, as well as the following: In re: Doggett, 04-0319 (La.5/25/04), 874 So.2d 805; In re: Hughes, 03-3408 (La.4/22/04), 874 So.2d 746; In re: Clark, 03-2920 (La.2/20/04), 866 So.2d 782; In re: Sharp, 03-2256 (La.10/29/03), 856 So.2d 1213; In re: Emanuel, 98-3142 (La.4/13/99), 755 So.2d 862; and In re: Wimbish, 98-2882 (La.4/13/99), 733 So.2d 1183.
[16] The Commission accepted the stipulated fact that the trips Judge Lee took, as described in the Formal Charge, were "court related." Notably, Judge Lee was not charged with any impropriety as to the number of trips she took or the nature of such trips.
[1] These numerous trips were taken despite decisional delays in 18 unreported cases for which there is a separate charge.