949 So.2d 379 (2007)
In re Judge Wendell R. MILLER.
No. 2006-O-2361.
Supreme Court of Louisiana.
January 26, 2007.
Opinion Concurring in Denial of Rehearing February 15, 2007.
Office of Special Counsel, Steven R. Scheckman, Special Counsel, for Applicant.
Hamilton & Hamilton, Orlando N. Hamilton, Jr., Oak Grove, The Nickel Law Firm, Milo Nickel, Jr., Schiff Law Corporation, Leslie J. Schiff, Opelousas, for Judge Miller.
*380 Nancy E. Rix, New Orleans, Commission Counsel.
TRAYLOR, Justice.
This matter comes before the Court on the recommendation of the Judiciary Commission of Louisiana ("Commission"), pursuant to LA. CONST. ANN. art. V, § 25(C), that Wendell R. Miller, District Judge of the 31st Judicial District Court, Parish of St. Jefferson Davis, State of Louisiana, be removed from judicial office and be ordered to pay the cost of these proceedings. After a thorough review of the facts and law in this matter, we find clear and convincing evidence sufficient to support the charges filed against Judge Miller and conclude that the Judiciary Commission's recommendation of discipline should be accepted.

FACTS and PROCEDURAL HISTORY
This judicial disciplinary proceeding was instituted by the Judiciary Commission of Louisiana ("Commission") against Judge Wendell R. Miller of the 31st Judicial District Court, Parish of Jefferson Davis, State of Louisiana. Judge Miller served as the Jefferson Davis Parish District Attorney from January 1, 1985 through December 31, 1990. Thereafter, he engaged in the private practice of law until November 1993, at which time he was elected as judge of the Jennings City Court.[1] Judge Miller served in that capacity for three years prior to his election to the 31st Judicial District Court. Judge Miller assumed his present office on January 1, 1997, and was re-elected without opposition on October 5, 2002 for a term of office commencing on January 1, 2003.

Formal Charges
The Commission filed six Formal Charges against Judge Miller on June 23, 2005. Five of the six charges arose out of Judge Miller's ten-year adulterous affair with his secretary, Heather Viator, while the sixth charge concerned Judge Miller's failure to comply with this court's policies regarding travel expenditures.
In January 1992, when he was an attorney in private practice, Judge Miller hired Heather Viator to work in his law office as a legal secretary. Ms. Viator worked for Judge Miller in his private law office until his election to the district court. When Judge Miller took the bench in the 31st Judicial District on January 1, 1997, Ms. Viator became his court secretary. Ms. Viator resigned from her position with the court by letter to Judge Miller dated November 21, 2002.
Judge Miller and Ms. Viator were engaged in a consensual sexual affair throughout the ten-year period that she worked for him. The relationship commenced in the spring or summer of 1992, at which time both Judge Miller and Ms. Viator were married to other people. In December 1993, Ms. Viator told Judge Miller that she was pregnant and that either he or Michael Viator, her husband, could be the child's father. On September 1, 1994, Ms. Viator gave birth to a baby boy, A.V.
In January 1995, Ms. Viator told Judge Miller that A.V. was his child.[2] Judge Miller then began giving cash to Ms. Viator, in addition to her salary, which he considered to be child support payments. Judge Miller made these extra payments *381 monthly and continued to do so throughout the time Ms. Viator worked for him. Judge Miller also arranged for Ms. Viator to receive a $300 monthly payment for janitorial services and a monthly "administrative supplement" of $500.
Ms. Viator and her husband separated in May 1996 and were divorced in May 1997. The sexual relationship between Judge Miller and Ms. Viator ended in July 2002. In November 2002, Judge Miller called Ms. Viator's ex-husband and told him about the affair. Judge Miller also shared with Mr. Viator his belief that he (Judge Miller) was the biological father of A.V. In March 2003, Judge Miller and his wife were divorced as the result of his adulterous affair with Ms. Viator. On May 29, 2004, Michael Viator and Heather Viator remarried each other.

Charge No. 0248

(Failure to comply with a federal court order)
On July 3, 2003, Ms. Viator filed suit against Judge Miller in federal court, asserting that Judge Miller sexually harassed her after their affair ended and constructively discharged her from her employment with the 31st Judicial District Court. Heather C. Viator v. Wendell Miller, individually and in his official capacity as Judge of the 31st Judicial District Court, No. CV03-1273 on the docket of the United States District Court for the Western District of Louisiana. Ms. Viator further complained that Judge Miller continued to contact her or to attempt to contact her, personally, by telephone, and in writing, despite her requests that he leave her alone and stop harassing her. Judge Miller denied Ms. Viator's allegations and contended that telephone and e-mail contact with Ms. Viator resumed in February of 2003 and was "mutually initiated."
On August 28, 2003, United States District Judge Patricia Minaldi entered a consent order prohibiting Judge Miller from having "direct or indirect contact or communication with Plaintiff Heather Viator or her daughter." Thereafter, on three separate occasions in early 2004, Judge Miller mailed $400 checks to Ms. Viator at her home address. Judge Miller intended these checks as child support for A.V. and asserted that he mailed them only after Michael Viator took a DNA test, the results of which excluded him as the biological father of A.V.[3]
On June 1, 2004, Judge Minaldi held Judge Miller in contempt of court and fined him $500 for violating the order prohibiting him from contacting Ms. Viator. In her written reasons for judgment, Judge Minaldi stated:
. . . Left with no other means by which to assert his authority, the evidence establishes and the Court concludes that Miller sent the checks as a means of asserting paternity in an extra-judicial fashion, designed to harass and upset Ms. Viator in violation of this Court's order.
. . . [I]n light of the evidence that his motivation was harassment rather than the support of his child, the mailing of the checks is a willful violation of the Court and a calculated method of circumventing the Consent Order in a fashion designed to have the guise of moral righteousness.
*382 On June 13, 2005, the contempt order was affirmed in an unpublished opinion of the United States Court of Appeals for the Fifth Circuit.
In 2005, Ms. Viator's sexual harassment suit was settled by the State of Louisiana for the sum of $50,000.
The Commission alleged that Judge Miller's conduct violated Canons 1 (a judge shall uphold the integrity and independence of the judiciary) and 2A (a judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary) of the Code of Judicial Conduct. The Commission further alleged that Judge Miller engaged in persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute, in violation of La. Const. art. V, § 25(C).
In his answer to the formal charge, Judge Miller contended that the simple mailing of the child support checks to Ms. Viator did not violate the consent order, and he "continue[s] to be of this opinion despite the subsequent ruling of Judge Minaldi." Furthermore, Judge Miller disputed Judge Minaldi's conclusions as to his motivation for mailing the checks.

Charge No. 0249

(Inappropriate comments to the media about pending cases)
On July 7, 2003, Judge Miller filed a "Petition to Establish Filiation" of Ms. Viator's son. W.R.M. v. H.C.V. and M.J.V., No. 03-3614 on the docket of the 14th Judicial District Court for the Parish of Calcasieu.[4] On November 5, 2003, Michael Viator filed suit against Judge Miller, seeking damages as well as the annulment of the 1997 divorce judgment.[5]Michael Joseph Viator v. Wendell R. Miller, No. C-790-03 on the docket of the 31st Judicial District Court for the Parish of Jefferson Davis. Sometime after the filing of Mr. Viator's suit, Judge Miller gave an interview to a reporter for The Legal News of Southwest Louisiana. The interview formed the basis of a newspaper article titled "All I Want for Christmas . . ." in which Judge Miller discussed his long-term sexual relationship with Ms. Viator and the fact that he believes A.V. is his son. The article also refers to the fact that Judge Miller gave Ms. Viator monthly support for her son; to the fact that Judge Miller filed suit to establish the boy's paternity; and to the fact that Ms. Viator filed suit against Judge Miller for sexual harassment and discrimination. Both Ms. Viator's federal suit and Judge Miller's paternity suit were ongoing at that time. Judge Miller also issued at least two press releases to several newspapers to give his "side of the story."[6]
The Commission alleged that Judge Miller's conduct violated Canons 1, 2A, 2B (a judge shall not allow family, social, political, or other relationships to influence judicial conduct or judgment, nor shall a judge *383 lend the prestige of judicial office to advance the private interest of the judge or others), and 3A(8) (a judge shall not, while a proceeding is pending in any Louisiana state court, make any public comment that might reasonably be expected to affect its outcome or impair its fairness) of the Code of Judicial Conduct. The Commission further alleged that Judge Miller engaged in willful misconduct relating to his official duty and persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute, in violation of La. Const. art. V, § 25(C).

Charge No. 0250

(Letter of recommendation on court stationery)
Judge Miller wrote two letters of recommendation for Ms. Viator. The first letter, dated November 18, 2002, was typed by Ms. Viator and is on personal stationery.[7] The second letter, which is dated March 11, 2003, is on court stationery. The content of the two letters is essentially identical.
After a series of e-mails between Ms. Viator and Judge Miller on March 11 or 12, 2003, Judge Miller called John "Spike" Scofield, a Lake Charles attorney, to discuss Ms. Viator's application to work at his firm, Scofield, Gerard, Veron, Singletary & Pohorelsky. Judge Miller asked Mr. Scofield to interview Ms. Viator for a legal secretary position which his firm had advertised. During this conversation, Judge Miller told Mr. Scofield that he believed A.V. was his son. Ms. Viator was subsequently hired by the Scofield firm for a position as legal secretary, a position for which she had not been hired when she had applied previously.
The Commission alleged that Judge Miller's conduct violated Canons 1, 2A, and 2B of the Code of Judicial Conduct. The Commission further alleged that Judge Miller engaged in persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute, in violation of La. Const. art. V, § 25(C).
In his answer to the formal charge, Judge Miller offered the following explanation for his conduct:
On March 11th or 12th, 2003, Ms. Viator emailed me informing me that she had applied for employment at the law firm of John "Spike" Scofield. She knew that Mr. Scofield and I were long time acquaintances and through a series of emails she requested my help in getting an interview with Mr. Scofield's firm. I agreed to call Mr. Scofield and talked to both he and his secretary about Ms. Viator. Because of many years of friendship with Mr. Scofield, I felt it was necessary to be frank about Ms. Viator's relationship with me and my belief that AV was my son. I thought it was best that he know this before agreeing to interview and/or hire Ms. Viator, rather than learn of this afterward and feel that I had recommended her under false pretenses.

Charge No. 0251

(Recusal issues)
In May 1996, Ms. Viator and her husband separated. At this time, Judge Miller was a judge of the Jennings City Court and also maintained a private law practice. Judge Miller gave Ms. Viator legal advice and assisted her in drafting divorce, custody, and child support pleadings.
On May 20, 1997, by which time Judge Miller had become a district judge, he signed a consent judgment in the divorce *384 proceedings styled Heather Lynn Chisolm Viator v. Michael Joseph Viator, No. C-963-96 on the docket of the 31st Judicial District Court for the Parish of Jefferson Davis. The consent judgment (which was signed by the parties and counsel for Ms. Viator) granted Ms. Viator a divorce, awarded the parties joint custody of the two minor children,[8] designated Ms. Viator as the domiciliary parent, ordered Mr. Viator to pay $546.48 per month in child support to Ms. Viator, and ordered Mr. Viator to keep the two minor children on his insurance plan at work. The Viators were not present in the courtroom when the matter was submitted or when the judgment was signed, and no lawyers were present on their behalf.[9] Furthermore, no evidence or testimony was offered other than Ms. Viator's affidavit in support.
At the time he signed the consent judgment, Ms. Viator was still employed as Judge Miller's secretary; Judge Miller and Ms. Viator were still involved in a sexual affair; and Judge Miller believed that Ms. Viator's child A.V. was actually his own child. Furthermore, Judge Miller had given legal advice to Ms. Viator in the case before he took the bench. Any one of these four grounds necessitated Judge Miller's recusal from the matter; nevertheless, Judge Miller did not recuse himself from the Viator case before he signed the consent judgment. Moreover, Judge Miller knew that Mr. Viator was not aware of the possibility that he (Judge Miller) was the biological father of one of Ms. Viator's children. Despite his superior knowledge of these material facts, Judge Miller failed to disclose this information to Mr. Viator, failed to recuse himself from the case, and signed the consent judgment.[10]
On August 26, 1998, Judge Miller signed an order voluntarily recusing himself from the Viator case, stating the following reason for his recusal: "in order to remove any appearance of impartiality or impropriety for the following reasons: The plaintiff, Heather Lynn Chisolm Viator, is an employee of the 31st Judicial District Court." Judge Miller did not disclose any other facts making his recusal necessary.
The Commission alleged that Judge Miller's failure to recuse himself from the Viator divorce proceeding violated La. Code Civ. P. art. 151(B)(4) and (5).[11] The *385 Commission further alleged that Judge Miller's conduct violated Canons 1, 2A, 3A(1) (a judge shall be faithful to the law and maintain professional competence in it), 3A(4) (a judge shall perform judicial duties without bias or prejudice), and 3C (a judge should disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned and shall disqualify himself or herself in a proceeding in which disqualification is required by law or applicable Supreme Court rule) of the Code of Judicial Conduct. Finally, the Commission alleged that Judge Miller engaged in willful misconduct relating to his official duty, willful and persistent failure to perform his duty, and persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute, in violation of La. Const. art. V, § 25(C).
In his answer to the formal charge, Judge Miller denied that he gave Ms. Viator legal advice concerning her divorce. Judge Miller also denied that he acted improperly in signing the judgment of divorce in the Viator case. Judge Miller asserted that he was simply performing "a ministerial duty in signing the uncontested judgment submitted by the parties." Judge Miller further stated that he learned from Ms. Viator in August 1998 that "the parties were having disagreements on visitation matters. When I realized that a contested matter involving these parties might come before me, I recused myself."

Charge No. 0252

(Adulterous affair and sex at the courthouse)
Judge Miller and Ms. Viator were involved in a sexual relationship from 1992 until 2002. Throughout this period of time, Judge Miller was married to someone else. After Judge Miller took the bench in the 31st Judicial District Court in 1997, he engaged in sexual intercourse with Ms. Viator in his chambers at the courthouse once or twice a week. All of these sexual encounters occurred after business hours. Furthermore, Ms. Viator met Judge Miller at the courthouse on Sunday afternoons and on holidays "innumerable" times. On these occasions, the vehicles belonging to both Judge Miller and Ms. Viator may have been visible to anyone passing near the courthouse.
Ms. Viator's son, A.V., was born in September 1994. By late 1995 and early 1996, rumors had begun circulating in the community that Judge Miller was the father of A.V. Despite Judge Miller's knowledge of these rumors and of their likely truth, he frequently allowed Ms. Viator to bring her two children to the courthouse and on a few occasions allowed them to play in the courtroom when no proceedings were being conducted. Judge Miller also took A.V. with him to visit the Sheriff's Office.
After Ms. Viator left her employment at the court in 2002, Judge Miller told the district attorney, the sheriff, and other employees at the courthouse and in his office that he had had a sexual relationship with Ms. Viator and that he believed Ms. Viator's son was his own.
The Commission alleged that Judge Miller's conduct violated Canons 1 and 2A of the Code of Judicial Conduct. The Commission further alleged that Judge Miller engaged in persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute, in violation of La. Const. art. V, § 25(C).

*386 Charge No. 0253

(Travel expenditures)
In 2002, Judge Miller attended the City and Juvenile Judges' Conference held in New Orleans, the Spring Judges Conference held in Lafayette, and the Fall Judges Conference held in New Orleans. All together, Judge Miller was advanced, reimbursed, or had paid to him or on his behalf, travel, hotel, and meal expenses in the amount of $3,560.12 for these three trips. Under Louisiana Supreme Court travel guidelines, the maximum allowable travel, hotel, and meal expenses totaled $1,874.25, resulting in Judge Miller's receiving cash or services of $1,685.87 in excess of the maximum allowable amount for these items. These excess travel advances and expenditures resulted in negative audit findings by the Legislative Auditor's Office; in turn, the negative audit findings were reported in the Lake Charles newspaper, The American Press, in an article published on August 26, 2003 and entitled "Audit focuses on judge's expenses."
The Commission alleged that Judge Miller's failure to timely reimburse the court for excess travel advances and excess expenditures violated La. Const. art. VII, § 14 and La. R.S. 42:1461(A).[12] The Commission further alleged that Judge Miller's conduct violated Canons 1, 2A, and 3B(1) (a judge shall maintain professional competence in judicial administration) of the Code of Judicial Conduct. Finally, the Commission alleged that Judge Miller engaged in persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute, in violation of La. Const. art. V, § 25(C).

Joint Stipulation
On April 18, 2006, Judge Miller, through his counsel, Orlando "Nick" Hamilton, Jr., and the Office of Special Counsel jointly filed a "Statement of Stipulated Uncontested Material Facts." The facts stipulated by the parties are generally those as set forth above. However, a number of contested issues remained for trial and determination by the Commission, including the following:
1. Whether Judge Miller failed to comply with a federal court order requiring him to avoid contact with Ms. Viator, the plaintiff in a sexual harassment suit against him, as alleged in Charge No. 0248.
2. Whether Judge Miller violated Canons 1 and 2A of the Code of Judicial Conduct and La. Const. art. V, § 25(C), as alleged in Charge No. 0248.
3. Whether Judge Miller made inappropriate comments to the media about pending cases involving him as a litigant, as alleged in Charge No. 0249.
4. Whether Judge Miller violated Canons 1, 2A, 2B, and 3A(8) of the Code of Judicial Conduct and La. Const. art. V, § 25(C), as alleged in Charge No. 0249.
5. Whether Judge Miller inappropriately wrote a letter of recommendation on court stationery and initiated a personal call to the head of a law firm *387 on behalf of Ms. Viator, his long-time secretary and paramour who gave birth to a male child whom he believed to be his son, as alleged in Charge No. 0250.
6. Whether Judge Miller violated Canons 1, 2A, and 2B of the Code of Judicial Conduct and La. Const. art. V, § 25(C), as alleged in Charge No. 0250.
7. Whether Judge Miller inappropriately failed to recuse himself from the divorce, child custody, and child support proceedings involving Ms. Viator, his long-time secretary and paramour, and inappropriately failed to disclose facts requiring his recusal, as alleged in Charge No. 0251.
8. Whether Judge Miller gave legal advice to Ms. Viator and assisted her in drafting divorce, child custody, and child support pleadings, as alleged in Charge No. 0251.
9. Whether Judge Miller, at the time he signed the consent judgment on May 20, 1997, was aware that there was a good possibility that one of Ms. Viator's children born during the marriage was actually his child, as alleged in Charge No. 0251.
10. Whether Judge Miller knew that Michael Viator was unaware, at the time he agreed to the terms of the consent judgment, that Ms. Viator's son might not be his biological child, as alleged in Charge No. 0251.
11. Whether Judge Miller violated La. Code Civ. P. art. 151(B)(4) and (5) in failing to recuse himself from the Viator divorce proceedings, as alleged in Charge No. 0251.
12. Whether Judge Miller willfully concealed material facts and committed a fraud upon the court by failing to disclose to Michael Viator that he was very likely the biological father of Ms. Viator's son prior to signing the stipulated judgment on May 20, 1997, which ordered Mr. Viator to pay child support for and to maintain insurance coverage for a child he believed to be his, as alleged in Charge No. 0251.
13. Whether Judge Miller violated Canons 1, 2A, 3A(1), 3A(4), and 3C of the Code of Judicial Conduct and La. Const. art. V, § 25(C), as alleged in Charge No. 0251.
14. Whether Judge Miller violated Canons 1 and 2A of the Code of Judicial Conduct and La. Const. art. V, § 25(C), as alleged in Charge No. 0252.
15. Whether Judge Miller misused public funds for his own benefit by obtaining excess travel advances or reimbursements beyond those to which he was entitled under the Louisiana Supreme Court's travel policies, as alleged in Charge No. 0253.
16. Whether Judge Miller failed to timely reimburse the court for excess travel advances and expenditures and therefore violated La. Const. art. VII, § 14 and La. R.S. 42:1461(A), as alleged in Charge No. 0253.
17. Whether Judge Miller received or had paid on his behalf the aggregate amount of $3,560.12, after incurring properly reimbursable expenses for three trips in the amount of $1,874.25, creating the aggregate excess amount of $1,685.87, as alleged in Charge No. 0253.
18. Whether Judge Miller violated Canons 1, 2A, and 3B(1) of the Code of Judicial Conduct and La. Const. art. V, § 25(C), as alleged in Charge No. 0253.
In addition to the foregoing issues, upon which the Office of Special Counsel and Judge Miller could reach no agreement, *388 the parties were unable to agree upon the appropriate penalty in this case. For his part, Judge Miller argued that while his affair with Ms. Viator and the public's becoming aware of it were "regrettable," neither this conduct nor the other formal charges rise to the level of sanctionable misconduct; therefore, dismissal of all charges is appropriate, or at most, a private reprimand should be imposed.[13] On the other hand, the Office of Special Counsel argued that Judge Miller engaged in a pattern and practice of misconduct, all of which was public and received negative media attention; accordingly, either a lengthy suspension or removal from office is the appropriate sanction.
The Commission voted to accept the stipulated facts submitted by the parties. A brief hearing was conducted before the Commission on August 18, 2006, at which Judge Miller, Heather Viator, and Michael Viator were the only witnesses.

Recommendation of the Commission

(Conclusions of Fact and Law)
Formal Charge 0248: The Commission found that Judge Miller was held in contempt of court by Judge Minaldi after Judge Miller sent checks to Ms. Viator in violation of the federal judge's order that he not contact Ms. Viator. At the hearing, Judge Miller's attorney argued that the Commission should look beyond the contempt ruling, which Judge Miller continues to dispute, even though it was affirmed by the United States Court of Appeals for the Fifth Circuit. Counsel argued that the relatively small fine of $500 imposed by Judge Minaldi demonstrates that the contempt was not especially serious. The Commission disagreed with such arguments, concluding that the contempt ruling, affirmed on appeal, indicates that Judge Miller violated Canons 1 and 2A of the Code of Judicial Conduct. Furthermore, the Commission found that Judge Miller engaged in persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute, in violation of La. Const. art. V, § 25(C). The Commission observed that if Judge Miller's motives were directed solely toward helping A.V., he could easily have submitted the support payments to Ms. Viator's attorney through his own attorney. That Judge Miller sent checks directly to Ms. Viator caused the Commission to agree with Judge Minaldi that Judge Miller's actions were a means of asserting paternity in an extra-judicial fashion, designed to harass and upset Ms. Viator in violation of the court order that he not contact her.
Formal Charge 0249: Judge Miller did not dispute that he responded publicly when Ms. Viator filed a lawsuit based upon allegations of sexual harassment and when Mr. Viator filed suit to annul the divorce judgment. Judge Miller maintained, however, that because the suits were filed against him personally, somehow his right to defend himself in the public media arena superseded his obligation as a judge not to make public comments about a pending case "that might reasonably be expected to affect its outcome or impair its fairness." The Commission agreed with the Special Counsel that the manner in which Judge Miller responded to the press "was a thinly veiled attempt to create a more sympathetic image of him in the minds of the public, including potential federal court jurors." The Commission found that Judge Miller used all the power and prestige of his office in opposing Heather and *389 Michael Viator, and in so doing, he violated Canons 1, 2A, 2B, and 3A(8) of the Code of Judicial Conduct. The Commission further found that Judge Miller also engaged in willful misconduct relating to his official duty and persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute, in each case in violation of La. Const. art. V, § 25(C).
Judge Miller's attorney told the Commission at the hearing that "a litigant certainly has the right to give his side of it and not just allow the other side to bang him in the head, and that's what Judge Miller did." The Commission found that this argument failed to take into account that a judge is expected to have faith in the judicial system and recognize the right to "give his side of it" occurs in the court proceeding  not by making a media circus out of the case, and inflaming an already bad situation and that, moreover, Judge Miller's comments went beyond a simple denial.
The Commission was also persuaded by Judge Minaldi's determination that Judge Miller's motive was to seek sympathy for himself. The Commission agreed that this attempt to garner such sympathy was an attempt to affect the outcome of the case.
Formal Charge 0250: The Commission found that Judge Miller unethically transmitted a letter on official court stationery recommending Ms. Viator for employment. The letter was directed to an attorney with the Scofield, Gerard firm in Lake Charles. The Commission determined that by his delivery of a letter of recommendation on official court stationery, Judge Miller violated the express prohibition set forth in Canon 2A of the Code of Judicial Conduct.[14] Furthermore, Judge Miller called Mr. Scofield and gave Ms. Viator what he described in an e-mail as "a great recommendation." The Commission found that by these extra efforts to encourage Mr. Scofield to hire Ms. Viator, Judge Miller violated Canon 2B, which prohibits a judge from using the prestige of his judicial office for the benefit of another. The Commission noted that Ms. Viator had applied for a job at the Scofield firm previously and had not been hired, but when Judge Miller took extraordinary measures to recommend her, she got the job. The Commission further found that Judge Miller's conduct was also persistent and public conduct prejudicial to the administration of justice that brought his office into disrepute, in violation of La. Const. art. V, § 25(C).[15]
Formal Charge 0251: Judge Miller essentially stipulated to the truth of the factual allegations set forth in the charge, except that he denied giving Ms. Viator legal advice and assisting her in drafting divorce, custody, and child support pleadings. Further, Judge Miller did not deny that he knew he might be the father of A.V., but he testified that he was not really convinced of his paternity until A.V. was older and Judge Miller could detect a family resemblance. Based upon the admitted facts and Judge Miller's testimony at the hearing, the Commission concluded that he violated Canons 1, 2A, 3A(1), 3A(4), and 3C of the Code of Judicial Conduct.
*390 Considering that Judge Miller was having an ongoing sexual relationship with Ms. Viator and he knew of the possibility that A.V. was his son, the Commission found that he should have recused himself not only under Canon 3C, but also pursuant to La.Code Civ. P. art. 151(B)(5), as he was clearly biased in favor of his lover to the extent he could not conduct fair and impartial proceedings.
The Commission rejected Judge Miller's argument that he simply performed a ministerial act when he signed the Viator divorce/custody/support judgment. Similarly, the members rejected the notion put forth by Judge Miller that the judgment in question was a "consent" judgment, as Judge Miller was acting in his official capacity with knowledge that (1) Mr. Viator was unaware his wife had been engaging in a long-term affair with the presiding judge, and (2) Mr. Viator did not know the child he considered his son was likely the biological son of the presiding judge. The Commission found that Mr. Viator was financially and legally disadvantaged by not appreciating or exploring what his true options were as he entered into a purported consent arrangement, and he had been misled and manipulated by his wife who acted in concert with Judge Miller. The Commission found no evidence of knowing legal consent by Mr. Viator. The Commission believed Ms. Viator's testimony that Judge Miller approached her with her divorce decree and said, "You are divorced and you are mine," and they laughed about it. The Commission found that the consequence of the divorce personally and directly benefitted Judge Miller, as he then had freer access to his lover with her husband no longer in the picture.
Judge Miller argued at the hearing that it was ludicrous to expect him to recuse himself from the divorce proceedings, because taking himself off the case would have involved revealing to Michael Viator the affair between the judge and Ms. Viator. The Commission found this argument failed in light of Judge Miller's actions in 1998 when he recused himself from subsequent Viator proceedings and simply stated as his reason that Ms. Viator was his secretary.
Finally, the Commission determined that by signing the divorce judgment in the proceedings of Heather and Michael Viator, Judge Miller also violated La. Const. art. V, § 25(C) by engaging in willful misconduct relating to his official duty, willful and persistent failure to perform his duty, and persistent and public conduct prejudicial to the administration of justice that brought the judicial office into disrepute.
Formal Charge 0252: Judge Miller did not take issue with most of the factual allegations contained in this charge, in particular, that he engaged in assignations at the courthouse with Ms. Viator on innumerable occasions (Judge Miller stipulated to one or two times a week over a five-year period). Judge Miller emphasized to the Commission that in most instances these meetings occurred after hours and on weekends. He stipulated that these encounters were "in his chambers, in the conference area, or in the hallway outside of his office," but he argued that this was permissible because he and Ms. Viator used areas of the building that were not open to the public. Judge Miller further stipulated that he sometimes met Ms. Viator at the courthouse on the weekend, and their respective automobiles may have been visible to passers-by.
Judge Miller further admitted by stipulation that after Ms. Viator left his employ, he verified his sexual relationship with her to the district attorney, the sheriff, and other courthouse employees, and despite rumors that at least some outsiders knew *391 A.V. could be his son, he still brought A.V. and his sister, S.V., to the courthouse for them to play. Judge Miller stressed that even though rumors circulated, he was elected to judicial office in 1996 "and again in 2002 without opposition." Notably, however, he also testified that he did not think there was widespread knowledge about his relationship with Ms. Viator.
The Commission determined that the stipulated facts and hearing testimony establish a violation by Judge Miller of Canons 1 and 2A of the Code of Judicial Conduct. The Commission noted that a public courthouse is not an appropriate place for a judge to carry on an adulterous affair, especially on a weekly basis over a five-year period, a public building funded with taxpayer dollars is not intended to provide a secret location for a judge's sexual liaisons, that Judge Miller's chambers were not his private property, that it is irrelevant which rooms of the public building were used when he had sexual intercourse with Ms. Viator, and that this misuse of public property became known to the court staff, and probably others, clearly constituting persistent and public conduct prejudicial to the administration of justice that brought the judicial office into disrepute, in violation of La. Const. art. V, § 25(C).
Formal Charge 0253: Judge Miller misused public funds by obtaining excess travel advances or reimbursements in violation of Canons 1, 2A, and 3B(1) of the Code of Judicial Conduct and La. Const. art. V, § 25(C).
The Commission noted that it did not discern any true remorse by Judge Miller that his conduct as charged caused problems for so many people or generated so much negative publicity that impacted the judiciary and that his only regrets seemed to center around having to endure lawsuits and Judiciary Commission proceedings.
The record contains copies of sixteen newspaper articles printed between July 4, 2003 and March 3, 2006. The headlines ran the gamut from reporting the lawsuit filed by Ms. Viator alleging sexual harassment (and the settlement of that suit) to reports of Judge Miller having been found in contempt of court, and the final article publicizing that the "Court clears way for judge's paternity test." The Commission found that Judge Miller's indiscretions spawned these newspaper reports and, as a consequence, he brought the judicial office into disrepute.

Recommendation of Discipline
In recommending discipline, the Commission looked to the factors set forth by this court in In re: Chaisson, 549 So.2d 259 (La.1989),[16] and concluded as follows:
(a) and (b) Judge Miller's actions as set forth in the Formal Charges reflect an adulterous relationship that started prior to his service as a judge, but began to impinge upon his judicial office just a few *392 months after he assumed the district court bench in 1997, when he signed the Viator divorce/custody/support judgment. All of the sordid details of the affair and its aftermath have been widely publicized, and Judge Miller must take responsibility for that fact, even if he did not file the first lawsuit. The fact of his relationship with Ms. Viator is not per se the reason the Commission deemed his conduct as misconduct; rather, the unethical conduct stems from various actions violative of the Code of Judicial Conduct, and because his missteps have brought the judiciary as a whole into disrepute;
(c) and (d) Judge Miller's misconduct  taking judicial action in the Viator case, his inappropriate comments about a pending case, his wrongful letter of recommendation (and other efforts to assist Ms. Viator in getting a job), and his violation of travel policy terms as to his travel expense reimbursements  occurred with respect to his official judicial duties;
(e) Judge Miller stipulated to many facts and he stipulated as to the exhibits presented at the hearing, all regarding his actions and behavior as charged. However, he denied that he violated any provisions of the Code of Judicial Conduct or the Louisiana Constitution or that he abused his judicial authority;
(f) Judge Miller's affair with Ms. Viator has ended, but he testified to his conscious choice to continue to pursue a judgment of paternity of A.V. regardless of any further potential harm. The selfishness of his conduct supports Michael Viator's conclusion that in the final analysis, Judge Miller believes it is "all about him." His continuing efforts to be recognized as the biological father of A.V. will continue to place the entire matter before the public, and the judiciary as a whole will likely be negatively affected;
(g) Judge Miller took the district court bench in 1997, having been a city court judge since 1993. Thus he was not a new judge when the first complaints that gave rise to some of the charges were lodged. Even if he had been a new judge, had the facts been different, his having failed to understand that he should recuse himself from a case would no doubt have ended with a letter of counseling. Every judge, new or old, should know it is wrong to sign the document granting a divorce to his paramour and casting his lover's soon to be ex-husband with a support obligation with regard to a child that the judge knew might be his own. Even if that could be excused, critically, years later Judge Miller opposed Michael Viator's attempt to annul the divorce judgment, which compounded the first wrongful act;
(h) Other than the complaints that resulted in the Formal Charges, there have been no other complaints lodged against Judge Miller;
(i) Judge Miller's misconduct has had a significant negative effect upon the integrity of the judiciary for obvious reasons. Significantly, Judge Miller's conduct had a concrete and quantifiable $50,000 negative effect upon the finances of the State of Louisiana, as that was the settlement amount paid by the State on Judge Miller's behalf after Ms. Viator sued him for sexual harassment; and
(j) The Commission concluded that Judge Miller exploited his judicial position for personal gratification  he could only benefit by Heather and Michael Viator being divorced. He testified that the affair had been progressing for a number of years before the divorce, and so he contended it was not all that important to him whether Ms. Viator was divorced. The Commission found this testimony was not believable.
*393 The Commission imputed bad faith to Judge Miller because the evidence proved he permitted a personal obsession to affect his judicial duties, and he failed to overcome his romantic feelings that led to many wrongful acts, despite all of the negative consequences that have occurred. His conduct was egregious to the degree that he has tainted the judiciary. Further, that he so seriously and for such a long period of time permitted his personal desires to cloud his judgment casts doubt on his future decision making.
In order to protect the public, the Commission deemed it necessary "to make this public statement and recommendation of judicial discipline concerning the violations of the Code and Constitution by Judge Wendell Miller."
The Commission recognized that as a constitutional fact-finding body, it is not a court, and is not called upon or empowered by law to render legal judgments. With such caveat in mind, the Commission found the record demonstrates that Judge Miller's actions, as proven by clear and convincing evidence, were in violation of the Code of Judicial Conduct and the Louisiana Constitution of 1974, and that he should be severely disciplined by this court. Accordingly, the Commission recommended that Judge Miller be removed from judicial office and that he be ordered to reimburse and pay to the Commission the amount of $941.75 in hard costs.

DISCUSSION
This Court is vested with exclusive original jurisdiction in judicial disciplinary proceedings by La. Const. Art. V, § 25(C), and therefore has the power to make determinations of fact based on the evidence in the record and is not bound by, nor required to give any weight to, the findings and recommendations of the Judiciary Commission. In re King, XXXX-XXXX (La.10/21/03), 857 So.2d 432, 445. The charges against a judge must be proved by clear and convincing evidence before this Court can impose discipline. In re Hughes, XXXX-XXXX (La.4/22/04), 874 So.2d 746, 760.
Charge 0248: Failure to comply with a federal court order.
In this charge, the Commission alleged that Judge Miller violated a consent order entered in the United States District Court for the Western District of Louisiana which prohibited him from having "direct or indirect contact with [] Heather Viator or her daughter." Judge Miller mailed $400 checks to Ms. Viator on three separate occasions at her home address.
Judge Miller admits that he mailed the checks to Ms. Viator, only disputing that his action did not constitute violations of the court order. That the mailing of the checks did, in fact, violate the court order has already been determined by the Federal Court regardless of Judge Miller's disagreement with the finding. Although Judge Miller argues that the fact that he consulted with counsel prior to contacting Ms. Viator through mailing the checks mitigates in favor of a finding that he did not violate the court order, the Federal Court considered the consultation prior to making its ruling of a violation. This charge has been proven by clear and convincing evidence.
Charge 0249: Inappropriate comments to the media about pending cases.
During the pendency of two suits, a filiation suit filed by Judge Miller in the 14th Judicial District Court and the above mentioned federal suit, Judge Miller gave an interview regarding the suits which formed the basis of a newspaper article, as well as issuing two press releases discussing the facts of the cases. Judge Miller *394 admits making the comments to the media, but claims that the comments were not inappropriate considering that the cases were not before him as judge, but rather as a litigant. Here, it is apparent that Judge Miller's comments were intended to influence the courts and the public by lending the prestige of his office to the advancement of his private interests. Again, the charges were proved by clear and convincing evidence.
Charge 0250: Letter of recommendation on court stationery.
Judge Miller wrote two letters of recommendation for Ms. Viator, one of which was on court letterhead stationery. Again, Judge Miller admits that he wrote the letter of recommendation on court stationery and that the conduct was a clear violation of the Code of Judicial Conduct, but contends that the violation occurred purely through inadvertence. He further contends that because the recipient of the letter knew that he was a judge, there was no harm in his inadvertent use of the court stationery. Although a clear violation of the Canons, this admitted conduct would likely not rise to the level of sanctionable conduct were it standing alone.
Charge 0251: Recusal issues.
While serving as city court judge and while maintaining a private law practice, according to Ms. Viator's testimony, Judge Miller gave Ms. Viator legal advice and assisted her in drafting divorce, custody, and child support pleadings. Later, after Judge Miller became a district court judge, he signed a consent judgment in the divorce proceedings, granting Ms. Viator a divorce, awarding the parties joint custody of the two children, designating Ms. Viator as the domiciliary parent, and ordering Mr. Viator to pay child support. Judge Miller's conduct with regard to the divorce proceeding occurred during the pendency of his affair with Ms. Viator and while he knew that he was likely the father of one of the children for which he ordered Mr. Viator to pay child support.
Judge Miller denies that he gave Ms. Viator legal advice and assisted her in drafting pleadings, however, given his overall conduct in connection with this divorce proceeding, Judge Miller's credibility in this regard is low. Therefore, we agree with the Commission that this charge was proved by clear and convincing evidence.
Charge 0252: Adulterous affair and sex at the courthouse.
Judge Miller and Ms. Viator were engaged in an extra-marital affair for approximately ten years. Judge Miller admitted that he and Ms. Viator had sexual relations at the courthouse on numerous occasions and that, following the termination of Ms. Viator's employment with him, he confirmed to the sheriff, the district attorney, and various courthouse employees his sexual relationship with her. We agree with the Commission that an adulterous affair is not a per se violation of the Code of Judicial Conduct, but the Judge's rather open and notorious sexual conduct with his secretary at the courthouse, coupled with the other factors involved in the relationship, clearly brought the judicial office into disrepute.
Charge 0253: Travel expenditures.
Judge Miller attended three judicial conferences and claimed expenses and received cash and services which were $1,685.87 in excess of the maximum allowable amount according to the Louisiana Supreme Court travel guidelines. These excess travel expenditures were reported in audit findings by the Legislative Auditor's Office and revealed in a Lake Charles newspaper. We agree with the Commission that this charge was proven by clear and convincing evidence.

*395 CONCLUSION
Upon review of the record, we conclude that removal is warranted in this case. The sheer magnitude of the gross violations of Canons 1, 2A, 2B, 3A(1), 3A(4), 3A(8), 3B(1), 3C, La.Code Civ. P. art. 151(B)(4) and (5), La. R.S. 42:1461(A), and La. Const. art. VII, § 14, all resulting in bringing disrepute to the judicial office in violation of La. Const. art. V, § 25(C), is intolerable and mandates such serious discipline.

DECREE
For the foregoing reasons, we order that Judge Wendell R. Miller of the 31st Judicial District Court, Parish of Jefferson Davis, is hereby removed from office, and that his office is hereby declared vacant. Further, respondent is ordered pursuant to La. Sup.Ct. Rule XXIII, § 26 to refrain from qualifying as a candidate for judicial office for five years and until certified by this Court as eligible to become a candidate for judicial office. Finally, pursuant to La. Sup.Ct. Rule XXIII, § 22, we cast respondent with costs incurred in the investigation and prosecution of this proceeding in the amount of $941.75.
REMOVAL FROM JUDICIAL OFFICE ORDERED.
CALOGERO, Chief Justice, concurs in the result and assigns reasons.
VICTORY, Justice, concurs in the result and concurs in the reasons assigned by WEIMER, J.
KNOLL, Justice, dissents and assigns reasons.
WEIMER, Justice, dissents in part, concurs in the result and assigns reasons.
CALOGERO, Chief Justice concurs in the result and assigns reasons:
I concur in the majority's decision, including the sanction imposed. However, I do not agree with the findings and conclusions regarding charge number 0249 (inappropriate comments to the media about pending cases).
VICTORY, J., concurs in the result and concurs in the reasons assigned by Justice WEIMER.
KNOLL, Justice, dissenting.
For the following reasons, I respectfully dissent.
Justice Francois-Xavier Martin, a great Chief Justice of Louisiana, who was quoted in State ex rel. Attorney General v. Lazarus, 39 La. Ann. 142, 1 So. 361, 376 (1887), observed, "All those who minister in the temple of justice, from the highest to the lowest, should be above reproach and suspicion. None should serve at its altar whose conduct is at variance with his obligations." To this, Justice Poche added: "The trust to enforce this lesson of wisdom has been confided to the supreme court, and, although the task is unpleasant, it must be performed impartially and fearlessly." Id. "The office of judge is one in which the general public has a deep and vital interest, and, because that is true, the official conduct of judges, as well as their private conduct, is closely observed. When a judge, either in his official capacity or as a private citizen, is guilty of such conduct as to cause others to question his character and morals, the people not only lose respect for him as a man but lose respect for the court over which he presides as well." Stanley v. Jones, 201 La. 549, 9 So.2d 678, 683 (1942).
Although I subscribe wholeheartedly to the sentiments expressed above, when I strip the salacious facts from the charges *396 leveled against Judge Miller and focus on the operative facts, I find neither any one nor a cumulation of the charges merits removal from office. This Court stated in In re Whitaker, 463 So.2d 1291 (La.1985): "The most severe discipline should be reserved for judges who use their offices improperly for personal gain; judges who are consistently abusive and insensitive to parties, witnesses, jurors and attorneys; judges who because of laziness or indifference fail to perform their judicial duties to the best of their ability; and judges who engage in felonious criminal conduct." With the exception of the issue of travel expenses, all of the charges of alleged misconduct stem from Judge Miller's amorous relationship with Heather Viator. Although I agree with Judge Miller's self-characterization, "I may have been foolish and not wise, and not given the situation enough foresight,"[1] I do not find the elements of this case merit the most severe discipline outlined in Whitaker. Having said this, I find it would be more appropriate to impose a significant sanction of suspension rather than to remove Judge Miller from office.
As I perceive the facts of this case, the most disturbing elements center on Judge Miller's use of his chambers to conduct a consensual amorous affair with Ms. Viator and his failure to recuse himself when presented with the consent judgment in the divorce proceedings styled Heather Lynn Chisolm Viator v. Michael Joseph Viator. Simply stated, the prolonged use of private, judicial chambers in a public building to facilitate a consensual adulterous affair constitutes persistent, public conduct prejudicial to the administration of justice and further brings the judicial office into disrepute.
Similarly, Judge Miller's failure to self-recuse under LA.CODE CIV. PROC. ANN. art. 151 constitutes conduct deserving of a significant sanction. Although on most occasions the signing of a consent judgment by a district court judge may be considered a ministerial act, this consent judgment did not fit that description. Notwithstanding the amorous affair going on between the two, Judge Miller was Ms. Viator's employer at the time of the divorce and that long-time relationship alone should have been grounds for his recusal under the provisions of LA.CODE CIV. PROC. ANN. arts. 151(5) and 152 (providing that a judge may self-recuse when he "[i]s biased, prejudiced, or interested in the cause or its outcome or biased or prejudiced toward or against the parties or the parties' attorneys to such an extent that he would be unable to conduct fair and impartial proceedings."). *397 [2] "[T]he tantamount duty of a judge is to conduct fair and impartial proceedings. If he cannot conduct a fair and impartial proceeding because of bias or prejudice," he must recuse himself. In re Cooks, 96-1447 (La.5/20/97), 694 So.2d 892, 903. However, at the end of the day, I note that had Judge Miller recused himself from participation in this consent divorce decree, as he did later in this case for the very reason stated above, the result would have been the same  another judge would have reviewed the documents and pleadings and would have signed the judgment of divorce.
I find no merit to the charge brought against Judge Miller because he allegedly made inappropriate comments to the media about pending litigation. Initially, I note Judge Miller's comments were not made in regard to litigation pending in his court, but rather touched upon matters only involving Judge Miller personally as a litigant. There simply is not clear and convincing evidence that Judge Miller made statements intended to affect any court proceeding or impair the fairness of the pending proceeding against him. Compare In re Roe, 06-1243 (La.6/23/06), 931 So.2d 1076 (publicly censuring a district judge for making newspaper comments about a case tried in his court at a time when the case was on appellate review).
As to reimbursement to the judicial fund issue, I find a violation by Judge Miller to timely reimburse the court for excess travel advances and excess expenditures, but do not find it warrants significant disciplinary action. See In re Granier, 04-3031 (La.6/29/05), 906 So.2d 417 (judge publicly censured and ordered to reimburse the judicial expense fund for monies expended for work a registered nurse performed for the court and for hiring the nurse because the judge and she were romantically involved). Judge Miller stated his mis-appreciation of the financial guidelines and the permissible purposes for the expenditures from the Judicial Expense Fund, and now recognizes the proper procedure for the treatment of such expenses. My appreciation of the evidence shows Judge Miller's use of travel and expense reimbursement is neither extensive nor lavish, and generally his participation in judicial functions is limited to in-state functions. As shown by the record, Judge Miller's shortcomings in this regard involved his attendance at the 2002 City and Juvenile Judges' Conference held in New Orleans, the 2002 Annual Spring Judges Conference held in Lafayette, and the 2002 Annual Fall Judges' Conference held in New Orleans, and involved an aggregate overpayment to him of $1,685.87. Compare In re Lee, 06-0454 (La.7/6/06), 933 So.2d 736 (meting a 120-day suspension for a judge who inter alia went on 28 court-related trips in a three-year period, owed money to the court for 19 of the 28 trips, failed to timely file expense and travel reports, and failed to repay court for advanced travel costs). Accordingly, I find Judge Miller should be ordered to reimburse the Judicial Expense Fund in the amount of $1,685.87 and be cautioned accordingly. However, I find the public fisc protected in all other respects.
I likewise find a sanction merited for Judge Miller's use of court stationery to write a letter of recommendation on behalf of Ms. Viator, but only when it is considered with the other charges of misconduct. It is evident the use of court stationery was inadvertent, coming on the heels of an *398 earlier similar recommendation written on personal stationery, which basically restated the content of the earlier letter. The evidence shows Judge Miller's judicial standing was well known to the recipient of the letter of recommendation and the inadvertent use of court stationery was clearly superfluous. As provided in Canon 2B, a judge may use his judicial title when he writes a letter of recommendation. Because the Thirty-First Judicial District Court is a single-judge district, the use of court stationery added nothing more advantageous to Ms. Viator than did the judge's inclusion of his title in the closing of the letter. As we noted in In re Thibodeaux, 99-0014 (La.7/7/99), 737 So.2d 1284, "all violations of the Canons of the Code of Judicial Conduct do not always rise to the level of sanctionable conduct."
I now turn to the contempt ruling the Federal court imposed in response to Judge Miller's mailing of child support payments to Ms. Viator after he was ordered not to directly or indirectly "contact or communicate with Plaintiff Heather Viator or with her daughter." Judge Miller expressed that it was his intention to reinstitute child support payments because he learned that Ms. Viator's husband had conducted an informal DNA test that excluded Mr. Viator as the father of AV. Although I find Judge Miller's motivation mitigates the severity of this violation of the court order, it cannot be denied the three child support payments Judge Miller made contravened that order and should be considered along with the other viable charges in deciding an appropriate sanction. However, I do not find Judge Miller's contempt citation justifies his removal from the district court bench.
Considering the various elements of misconduct proven, I find a suspension, rather than removal from the bench as the majority proposes, more appropriate to protect the public. In reaching that conclusion, I am swayed by the fact that Judge Miller's actions complained of herein, with the exception of his failure to reimburse the Judicial Expense Fund, involve him personally, do not affect other aspects of Judge Miller's judicial docket, and no evidence has been adduced to convince me that Judge Miller has failed to perform his judicial duties to the best of his duty. As observed in In re King, 03-1412 (La.10/21/03), 857 So.2d 432, when the Judiciary Commission considers the removal of a judge, that judge's conduct should be assessed in light of cases where this Court has removed other Louisiana judges rather than conducting an analysis under In re Chaisson, 549 So.2d 259 (La.1989). Compare In re Haggerty, 257 La. 1, 241 So.2d 469 (1970) (judge removed because, in part, he associated with "purported underworld characters," procured pornographic material, struck a police officer, was involved in gambling activities, and resisted arrest); In re Huckaby, 656 So.2d 292 (La.1995) (judge removed for guilty plea in federal court to misdemeanor count of failing to file tax return and for failing to timely file income tax returns for 10 years); In re Johnson, 96-1866 (La.11/25/96), 683 So.2d 1196 (judge removed from office for operating a prison telephone system through contracts with the sheriff and a long distance carrier); In re Jefferson, 99-1313 (La.1/19/00), 753 So.2d 181 (judge removed for a pattern of abusing and exceeding his contempt authority, dismissing criminal cases for contrived reasons, improperly issuing gag orders, engaging in the unauthorized practice of law, and failing to comply with this Court's order relieving him from administrative duties); In re Hunter, 02-1975 (La.8/19/02), 823 So.2d 325 (judge removed for utter failure to discharge her administrative duties in a diligent and professionally competent manner and her ongoing *399 refusal to cooperate with the appellate court in securing record transcripts for appellate review); In re King, 03-1412 (La.10/21/03), 857 So.2d 432 (judge removed because of campaign misconduct, and his lying under oath to the Judiciary Commission); In re Hughes, 03-3408 (La.4/22/04), 874 So.2d 746 (judge removed for her flagrant and persistent failure to observe regular and predictable court hours, abusive and insensitive to the persons who came before her and to the juvenile court as a whole, her demonstrated inability to prepare judgments in a timely manner, her questionable practice of conducting court by phone and/or allowing staff to run the docket in her absence, her failure to ensure that an accurate record was made of all proceedings in her section of court, and by employing staff persons who were either convicted felons or who lacked qualifications for the jobs in question).
In stark contrast to those removal cases, I draw attention to In re Harris, 98-0570 (La.7/8/98), 713 So.2d 1138, 1141, a case I find far more egregious than the present matter. In that case, Judge Harris not only associated publicly with a known felon, she entered into a extramarital affair with a felon who pleaded guilty in her court and was illegally sentenced by her for his criminal act, which allowed the felon to be paroled. Additionally, this relationship became publicized in a lengthy article in the BATON ROUGE ADVOCATE which articulated the fact that Jones had been sentenced by Judge Harris for the felony he committed. Toward the end of their extramarital affairs, the convicted felon engaged in a crime spree in East Baton Rouge Parish, including car theft, burglary of an inhabited dwelling, and armed robberies of two fast food outlets and a shoe store before his parole was revoked. In the light of those facts, this Court only suspended Judge Harris without pay for sixty days. I further contrast the present facts to those in In re Whitaker, 463 So.2d at 1291. There this Court suspended the judge for one-year because he associated with users and sellers of illegal drugs and with prostitutes, and engaged in criminal activity, i.e., the smoking of marijuana.
When I compare the facts of the present case to this sampling of cases, I find Judge Miller was incredibly foolish, unwise, and lacking in foresight. The conflict of interest charge is by far the most damaging charge against Judge Miller. There is no question that he should have recused himself. The recusal charge alone raises the question of whether he should be removed from office. Notwithstanding, this issue is raised in a consent decree matter, where neither the litigants nor the attorneys appeared. When subsequent contested issues were raised, Judge Miller did recuse himself. In my view, the most damaging effects are personal to all those involved as a result of the relationship between Judge Miller and Ms. Viator. However, while I find a harm visited upon the judiciary as a result of Judge Miller's conduct, I would not find the most severe sanction of removal from office, but rather would impose a significant sanction of suspension.
WEIMER, J., dissenting in part and concurring in the result.
I have concerns about finding a violation of Charge No. 0249 relative to inappropriate comments to the media about pending cases. Although a judge must yield certain constitutional rights regarding freedom of speech, the matters of which Judge Miller spoke were not about cases before him as a judge; rather he spoke of a case in which he was a litigant.
The record does not establish by clear and convincing evidence that Judge Miller made any statement which was intended to *400 affect any court proceeding or impair the fairness of any proceeding. See CJC, Canon 3(A)(8). I find the record evidence inadequate to disprove the Judge's contention that his intent in responding to the published reports was to correct what he believed to be false and inflammatory information being disseminated to the media.
Nevertheless, I concur in the discipline imposed.

ON APPLICATION FOR REHEARING
Rehearing denied.
WEIMER, J., concurring.
I concur in the rehearing denial. Although a majority of this court did not find a violation in connection with Formal Charge 0249, a majority did concur in the sanction of removal.
CALOGERO, C.J., and VICTORY, J., concurred in the reasons assigned by WEIMER, J.
KNOLL, J., would grant rehearing.
NOTES
[1] Judge Miller continued to legally engage in the private practice of law throughout his term as city court judge.
[2] Judge Miller and the Office of Special Counsel have stipulated that years later, in April 2003, Ms. Viator told Judge Miller he was not the child's father. Ms. Viator claims that at the time she made this statement she was angry at Judge Miller because of certain events that had transpired between them.
[3] This was apparently a "home" DNA test that Mr. Viator ordered over the Internet. He testified that he received "a little thing of swabs. And I told A.V. that the dentist said that he was having too many cavities and so we needed to check. And I took my little swab in there. . . ." Mr. Viator was subsequently informed that this test excluded him as the biological father of A.V.
[4] On February 1, 2005, the trial court granted an exception of prescription filed by the Viators and dismissed Judge Miller's suit. On March 1, 2006, the court of appeal reversed the trial court's ruling on constitutional grounds. W.R.M. v. H.C.V. and M.J.V., 05-0425 (La.App. 3rd Cir.3/1/06), 923 So.2d 911. The Viators then applied for writs to this court, which docketed the matter as an appeal in 06-CA-0702. The court heard oral argument in that matter on October 19, 2006.
[5] Judge Miller opposed Mr. Viator's lawsuit, and in August 2005, the trial court dismissed the suit with prejudice.
[6] Judge Miller contends that the press releases were provoked by the actions of Ms. Viator and her attorney, Jill Craft, in intentionally releasing information to the press concerning the ongoing civil litigation.
[7] November 18, 2002 was Ms. Viator's last day of work at the 31st Judicial District Court.
[8] In addition to A.V., Ms. Viator has a daughter, S.V., who was born during her marriage to Michael Viator.
[9] Ms. Viator has testified that after the judgment was signed, Judge Miller approached her and said, "You are divorced and you are mine," and they laughed about it.
[10] The formal charge alleges that Judge Miller's failure to disclose these facts to Mr. Viator constituted a "willful concealment" and "a fraud upon the court."
[11] La.Code Civ. P. art. 151 provides in pertinent part as follows:

A. A judge of any court, trial or appellate, shall be recused when he is a witness in the cause.
B. A judge of any court, trial or appellate, may be recused when he:
(1) Has been employed or consulted as an attorney in the cause, or has been associated with an attorney during the latter's employment in the cause;
(2) At the time of the hearing of any contested issue in the cause, has continued to employ, to represent him personally, the attorney actually handling the cause (not just a member of that attorney's firm), and in this case the employment shall be disclosed to each party in the cause;
(3) Has performed a judicial act in the cause in another court;
(4) Is the spouse of a party, or of an attorney employed in the cause; or is related to a party, or to the spouse of a party, within the fourth degree; or is related to an attorney employed in the cause; or to the spouse of the attorney, within the second degree; or
(5) Is biased, prejudiced, or interested in the cause or its outcome or biased or prejudiced toward or against the parties or the parties' attorneys to such an extent that he would be unable to conduct fair and impartial proceedings.
[12] La. Const. art. VII, § 14(A) provides in pertinent part that "the funds, credit, property, or things of value of the state or of any political subdivision shall not be loaned, pledged, or donated to or for any person, association, or corporation, public or private." La. R.S. 42:1461(A) provides in pertinent part that public officials and employees shall not "misappropriate, misapply, convert, misuse, or otherwise wrongfully take any funds, property, or other thing of value belonging to or under the custody or control of the public entity in which they hold office or are employed."
[13] Subsequently, Judge Miller filed a pleading in which he conceded that he should be censured for failing to recuse himself from the Viator divorce case. Judge Miller repeated this assertion in his testimony before the Commission.
[14] The Commission found it irrelevant that Judge Miller had transmitted a prior letter on his personal stationery, which was in compliance with the Code of Judicial Conduct.
[15] While counsel for Judge Miller characterized this as the "Mickey-Mouse charge that has never been sanctioned by . . . the Louisiana Supreme Court" and "a technical violation of the Code," the Commission disagreed and concluded that had this charge stood alone, the Commission would still have recommended that Judge Miller be publicly censured by this court.
[16] In Chaisson, this court, citing Matter of Deming, 108 Wash.2d 82, 736 P.2d 639, 659 (1987), set forth a non-exclusive list of factors a court may consider in imposing discipline on a judge:

(a) whether the misconduct is an isolated instance or evidenced a pattern of conduct; (b) the nature, extent and frequency of occurrence of the acts of misconduct; (c) whether the misconduct occurred in or out of the courtroom; (d) whether the misconduct occurred in the judge's official capacity or in his private life; (e) whether the judge has acknowledged or recognized that the acts occurred; (f) whether the judge has evidenced an effort to change or modify his conduct; (g) the length of service on the bench; (h) whether there have been prior complaints about this judge; (i) the effect the misconduct has upon the integrity of and respect for the judiciary; and (j) the extent to which the judge exploited his position to satisfy his personal desires.
[1] Though it may be a legal truism, this Court, as it pondered the ramifications of judicial misconduct, recognized in In re Whitaker, 463 So.2d 1291, 1295 (La.1985), that judges are human beings. See also Louque v. Hercules Oil Co., 165 La. 143, 115 So. 416 (1927) (holding that judges are human and, like all humans, they sometimes err). "[T]he attainment of a professional status, per se, does not endow a man with the exclusively divine attribute of infallibility. No matter what dizzy height of professional eminence a man may achieve he, nonetheless, remains human and therefore subject to error, be he lawyer, judge, educator, doctor, soldier, scientist or minister. `Professional' is not synonymous with `perfection'." Thomas v. Lobrano, 76 So.2d 599, 606-06 (La.App. 2 Cir.1954). "In our legal system the judge holds a position of honor and esteem. Because of his position, a judge should always strive toward the highest standard of conduct. He should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary. Code of Judicial Conduct, Canon 2 A; State v. Wimberly, 414 So.2d 666 (La.1982) . . . Though the judge strives to maintain these standards he is, nevertheless, still human and is subject to the entire range of human emotions and shortcomings." State v. Turner, 440 So.2d 834, 837 (La.App. 2 Cir.1983).
[2] My appreciation of the record is that the divorce was not based upon Ms. Viator's affair with Judge Miller. Moreover, there is nothing to indicate Ms. Viator made her husband aware that she was involved in an adulterous affair with her employer, Judge Miller.